















MNA   4/2/03   9:37

3:03-CV-00633   FIRST AMERICAN REAL V. CONSUMER BENEFIT

*1*

*NTCREM.*



1   SCOTT J. FERRELL, STATE BAR NO. 202091
DAVID R. SUGDEN, STATE BAR NO. 218465

2   CALL, JENSEN & FERRELL

3   A Professional Corporation
610 Newport Center Drive, Suite 700

4   Newport Beach, CA  92660
(949) 717-3000

5

6   DAVID J. FISH, STATE BAR NO. 6269745
THE COLLINS LAW FIRM

7   1770 North Park Street, Suite 200
Naperville, IL  60563

8   (630) 527-1595

9   Attorneys for Defendant Consumer Benefit Services, Inc.

10

11                     **UNITED STATES DISTRICT COURT**

12                     **SOUTHERN DISTRICT OF CALIFORNIA**

13

14   FIRST AMERICAN REAL ESTATE   |   Case No.
INFORMATION SERVICES, INC., a

15   California corporation,   |   **'03 CV   0633B   JAH**

16           Plaintiff,   |   **NOTICE OF REMOVAL OF ACTION
UNDER 28 U.S.C. § 1441(b)**

17

18           vs.

19   CONSUMER BENEFIT SERVICES, INC.
an Illinois corporation; FACBS LLC, a

20   California limited liability company; and
DOES 1 through 50, inclusive,

21

22           Defendant.

23

24       **TO THE CLERK OF THE ABOVE-ENTITLED COURT:**

25       **PLEASE TAKE NOTICE THAT**, pursuant to 28 U.S.C. §§ 1332 and 1441,

26   defendant Consumer Benefit Services, Inc. ("CBS") hereby gives notice of the removal

27   of this action from the Superior Court for the County of San Diego, to the United States

28

CALL, JENSEN &
FERRELL
A PROFESSIONAL
CORPORATION

District Court for the Central District of California.    In support of the Notice of Removal, CBS avers as follows:

1.    On or about March 7, 2003, an action was commenced in the Superior Court of the State of California in and for the County of San Diego, entitled <u>First American Real Estate Information Services, Inc., a California corporation v. Consumer Benefit Services, Inc. an Illinois corporation; FACBS LLC, a California limited liability company; and DOES 1 through 50, inclusive,</u> as Case Number GIC806758.  A copy of the Complaint is attached hereto as Exhibit "A."    Copies of the Summons and Complaint have not been properly served on CBS (counsel for Plaintiff provided counsel for Defendant with a courtesy copy of the complaint).    CBS has neither received nor been served with any other pleadings in this matter, nor has CBS answered, moved or otherwise pled with respect to the Complaint, and the time for responding to such has not yet expired.

## The Parties

2.    Plaintiff First American Real Estate Information Services, Inc. ("FAREISI") is a California corporation with major offices in Poway, California. Complaint, ¶ 1.

3.    Defendant Consumer Benefit Services, Inc. ("CBS") is an Illinois company with its principal place of business in Illinois.

4.    FACBS LLC ("FACBS") is a California limited liability company with its principal place of business and office in California; however, FACBS is a nominal defendant. Complaint, ¶ 3.

/ / /

/ / /

CALL, JENSEN &
FERRELL
A PROFESSIONAL
CORPORATION

CON09-01:Notice of Removal:3-28-03                    - 2 -

NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. § 1441(b)

**The Claims**

5.     The Complaint alleges that FAREISI is entitled to involuntarily dissolve FACBS and seeks declaratory relief.   In addition, FAREISI alleges that CBS wrongfully breached a written contract and seeks damages in the sum of $2,029,166.63, plus interest.

**Complete Diversity Exists Between The Parties**

6.     This Court has original jurisdiction of this civil action, pursuant to 28 U.S.C. §§ 1332 and 1441, because it is a civil action between citizens of different states and the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.   The citizenship of FACBS should be disregarded for determining jurisdiction under 28 U.S.C. §§ 1332 and 1441 on the ground that FACBS is named as a nominal party.   Complaint, ¶ 3.   Therefore, FACBS does not affect diversity jurisdiction and need not join in the removal.   *See e.g., Matchett v. Wold*, 818 F. 2nd 574, 576 (7th Cir. 1987) (nominal party does not affect diversity); *see also Farias v. Bexar County Bd. of Trustees*, 925 F. 2d 866, 871 (5th Cir. 1991) (joinder is not required of nominal defendants).

7.     The damages sought by Plaintiff for breach of contract agreement include "monetary damages in the sum of $2,029,166.63, plus interest at the rate of 10% per annum, commencing on April 30, 2003."   Complaint Prayer, ¶ 6.   The amount in controversy therefore clearly exceeds $75,000.

8.     CBS does not, by filing this Notice of Removal, waive any defenses that may be available to it.

/ / /

/ / /

/ / /

CALL, JENSEN &
FERRELL
A PROFESSIONAL
CORPORATION

CON09-01:Notice of Removal:3-28-03                     - 3 -

NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. § 1441(b)

1    WHEREFORE, CBS respectfully gives this Notice of Removal of the action now

2  pending in the Superior Court of California for the County of San Diego.  CBS requests

3  that this Court accept jurisdiction of this action and, henceforth, that this action be

4  placed on the docket of this Court for further proceedings, as if this action had initially

5  been instituted with this Court.

6

7  Dated:  March 28, 2003                    SCOTT J. FERRELL
                                            DAVID R. SUGDEN
8                                           CALL, JENSEN & FERRELL
                                            A Professional Corporation
9

10

11                                         By:
                                              David R. Sugden
12
                                           Attorneys for Defendant Consumer Benefit
13                                         Services, Inc.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CALL, JENSEN &
FERRELL
A PROFESSIONAL
CORPORATION

CON09-01:Notice of Removal:3-28-03                    - 4 -
                                    NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. § 1441(b)

**EXHIBIT A**

CIVIL BUSINESS OFFICE 10
CENTRAL DIVISION

A 9: 47

SUPERIOR COURT
COUNTY, CA

RECEIVED MAR 1 0 2003

COPY

1  PAYNE & FEARS LLP
   Daniel M. Livingston, Bar No. 105981
2  Thomas L. Vincent, Bar No. 149729
   Attorneys at Law
3  4 Park Plaza, Suite 1100
   Irvine, California 92614
4  Telephone: (949) 851-1100
   Facsimile: (949) 851-1212
5
   Attorneys for Plaintiff FIRST AMERICAN
6  REAL ESTATE INFORMATION SERVICES, INC.

7

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                    FOR THE COUNTY OF SAN DIEGO

10

11 FIRST AMERICAN REAL ESTATE          )  CASE NO.  GIC  806758
   INFORMATION SERVICES, INC., a       )
12 California corporation,             )
                                       )  COMPLAINT FOR:
13            Plaintiff,               )
                                       )  1.   INVOLUNTARY DISSOLUTION
14       vs.                           )       OF LIMITED LIABILITY
                                       )       COMPANY [CORP. CODE §
15 CONSUMER BENEFIT SERVICES, INC. an  )       17351];
   Illinois corporation; FACBS LLC, a California ) 2.  DECLARATORY RELIEF;
16 limited liability company; and DOES 1 through ) 3.  SPECIFIC PERFORMANCE; AND
   50, inclusive,                      )  4.   BREACH OF WRITTEN
17                                     )       CONTRACT
             Defendant.               )
18                                     )

19

20                         •

21                        GENERAL ALLEGATIONS

22    Plaintiff First American Real Estate Information Services, Inc. ("FAREISI") alleges:

23

24    1.    FAREISI is a California corporation, duly formed and existing under the laws of

25 California, with major offices in Poway, California.

26

27

28

                                                              COMPLAINT

                        EXHIBIT A – PAGE 5

2.     FAREISI is informed and believes, and on that basis alleges, that Defendant Consumer Benefit Services, Inc. ("CBS"), was and is an Illinois corporation, doing business in San Diego County, California.

3.     Defendant FACBS LLC ("FACBS") is a California limited liability company, duly formed and existing under the laws of California, with its principal place of business and office located in Poway, California. FACBS is a nominal defendant named solely for purposes of effectuating the relief sought herein.

4.     FAREISI is without information and knowledge at this time concerning the true names and capacities of the defendants named herein as DOES 1 through 50, inclusive. Therefore, FAREISI sues these defendants by such fictitious names. FAREISI will seek to amend this Complaint to allege such defendants' true names and capacities when such have been ascertained. FAREISI is informed and believes and based thereon alleges that each fictitiously named defendant was and is in some manner legally responsible for the events, breaches, wrongful conduct, injuries, and damages alleged in this Complaint.

5.     FAREISI is informed and believes and based thereon alleges that at all times relevant to this action, CBS and defendants named herein as DOES 1 through 50, inclusive, were the agents, consultants, employees, joint venturers, partners, affiliated entities and/or independent contractors of each of the other defendants and in undertaking the acts alleged herein and that each defendant was acting within the course and scope of such agency, affiliation and/or employment with the full knowledge and consent of each of the other defendants. FAREISI further alleges, based upon information and belief, that each of these defendant's conduct as alleged herein was undertaken with the knowledge of such acts, and each such act or omission was ratified by each of the other defendants.

6.     FAREISI and CBS are the sole members of FACBS, each owning 50% of the total membership interests of FACBS. The Operating Agreement for FACBS (the "Operating Agreement")

-2-

PAYNE & FEARS LLP
ATTORNEYS AT LAW
4 PARK PLAZA, SUITE 1100
IRVINE, CALIFORNIA 92614
(949) 851-1100

is dated as of July 31, 2000, and provides that the business and purpose of FACBS was limited to marketing, developing, testing, and operating retail membership programs and operating activities associated therewith.

## FIRST CAUSE OF ACTION

### (FOR INVOLUNTARY DISSOLUTION OF FACBS)

7.    FAREISI realleges and incorporates by reference paragraphs 1 through 6, inclusive, as though set forth in full.

**The Wells Fargo Confidential Credit Advisor Program**

8.    In or about October, 2000, FACBS and Wells Fargo Home Mortgage, Inc. ("Wells Fargo"), agreed to market a credit monitoring membership program to Wells Fargo mortgage account holders. On or about September 28, 2001, but effective as of March 1, 2001, FACBS and Wells Fargo entered into an Amendment and Restatement of Membership Services Marketing Agreement (the "Wells Fargo Agreement"). Among other things, pursuant to the Wells Fargo Agreement, FACBS was solely responsible for the marketing of the membership services and the costs associated therewith and Wells Fargo would be responsible for collecting the monthly membership charges it billed to its mortgage account holders who signed up for the credit reporting and monitoring program. The term of the Wells Fargo Agreement was for two years from March 1, 2001, subject to cancellation thereafter upon 90 days notice.

9.    The membership services, also called "Confidential Credit Advisor," offered customers a 30-day free trial, including a free three (3) bureau credit report, unlimited three bureau credit reports upon request, monitoring of the three bureau credit files with notification of significant changes, home value comparable reports upon request, a quarterly newsletter, toll-free customer service and credit

PAYNE & FEARS LLP
ATTORNEYS AT LAW
4 PARK PLAZA, SUITE 1100
IRVINE, CALIFORNIA 92614
(949) 851-1100

-3-

1   advocacy services.   The program was marketed through direct mail, telemarketing and billing

2   statement inserts.

3

4       10.   A Wells Fargo mortgage account holder who responded positively to a marketing

5   solicitation would be given immediate membership.  If, after a 30-day free trial period, the account

6   holder did not cancel their membership, Wells Fargo would begin billing the account holder on their

7   monthly mortgage statements.

8

9       11.   For the account holder to receive the free three bureau credit reports and all other

10  subsequent credit and credit-monitoring reports, the account holder had to complete and return a credit

11  report authorization form.  Two of the three credit bureaus would not release the credit information

12  without such written authorization.  The customers who responded to the billing insert or direct mail

13  solicitations did so in writing, automatically providing the written authorizations required by the credit

14  bureaus.  Account holders who became members through telephone solicitation, however, could not

15  receive their credit reports until they completed and returned the authorization form that was included

16  in the "Welcome Kit" sent to new members.

17

18      12.   In or about March 2002, Wells Fargo expressed concern to FACBS that the vast

19  majority of its customers who had signed up for membership services through a telemarketing

20  program and had been billed for membership services had not activated their membership services and

21  had not received their three bureau credit reports or other benefits of their membership services.  More

22  than 46,000 account holders who had been enrolled for membership services through telephone

23  solicitation had not received their credit reports or other membership services because they had not

24  signed and returned the authorization form.

25

26      13.   In or about May 2002, Wells Fargo asserted that the telemarketing program and the

27  Welcome Kit associated with the Wells Fargo Agreement was deficient and did not adequately explain

28  the two-step process necessary for the account holders to receive their credit reports.  In June, 2002,

PAYNE & FEARS LLP
ATTORNEYS AT LAW
4 PARK PLAZA, SUITE 1100
IRVINE, CALIFORNIA 92614
(949) 851-1100

-4-



**COMPLAINT**

EXHIBIT A – PAGE 8

1   Wells Fargo, against the recommendation of FACBS, decided to return all membership fees collected

2   from customers who joined the program through telemarketing solicitations but who had not activated

3   their accounts in writing. Wells Fargo further made demand to FAREISI to indemnify and pay all

4   expenses associated with the telemarketing program and the membership services for which fees had

5   been collected but which had not been fully activated.

6

7   14.   The demand made by Wells Fargo was made in such a manner that it required an

8   immediate decision and response by FAREISI. Throughout, CBS was informed of FAREISI's efforts

9   to resolve the problem short of a refund. In June 2002, FAREISI paid the Wells Fargo demand of $4.9

10   million to reimburse Wells Fargo for the membership fees it would reimburse its customers to

11   minimize FACBS' risks and the potential adverse consequences that could befall FACBS as a result

12   of the activities associated with the Wells Fargo Agreement.

13

14   **The Cessation of Future Retail Membership Program Agreements**

15

16   15.   Pursuant to the Operating Agreement for FACBS, CBS entered into a service

17   agreement with FACBS wherein CBS agreed to provide certain products, services and non-cash

18   resources to develop, test and operate the retail membership programs. CBS would, in effect, provide

19   at its cost, the coordination, infrastructure, marketing and exchange of materials required for the retail

20   membership programs.

21

22   16.   During the operation of the Wells Fargo Agreement, FAREISI pursued a retail

23   membership program with various subsidiaries of J.P. Morgan/Chase ("Chase"). As part of its efforts

24   to obtain the Chase business, FAREISI requested that CBS provide a bid for the services it provides

25   for the retail membership programs. In or about March 2002, CBS submitted to FAREISI a bid for

26   services, which was purportedly similar to what had been submitted to Wells Fargo. CBS' bid for

27   services initially was $5.00 for member set-up and $1.00 per month per member. After modifying

28

PAYNE & FEARS LLP
ATTORNEYS AT LAW
4 PARK PLAZA, SUITE 1100
IRVINE, CALIFORNIA 92614
(949) 851-1100

-5-

**COMPLAINT**

**EXHIBIT A – PAGE 9**

1  some proposed services, CBS subsequently revised its bid to $4.30 for member set up and $0.80 per

2  month per member.

3

4      17.    On or about March 26, 2002, a board meeting of FACBS was held in Poway,

5  California. At that meeting, member representatives for CBS and FAREISI agreed to freeze and to

6  not proceed with any new retail membership program agreements. At that time, CBS was interested

7  solely in the Wells Fargo Agreement. At this time, CBS was aware of FAREISI's pursuit of the Chase

8  business and that the agreement to not allow FACBS to proceed with any new retail membership

9  program agreements would preclude FACBS from entering into any retail membership program

10  agreements with Chase.

11

12      18.    In about April and May 2002, FAREISI obtained additional bids from vendors other

13  than CBS for the services required for the Chase retail membership program. FAREISI obtained bids

14  from four other vendors. The highest bid received for a membership set-up fee was $.040 and the

15  highest monthly member fee was $0.22. The average membership set-up fee from the four other

16  bidders was $0.3525 per member and the average monthly fee per member was $0.1975.

17

18      19.    Upon receipt of the other bids, FAREISI offered to have CBS provide to FAREISI the

19  services it was providing at $0.47 per member for the set-up fee and $0.22 for the monthly member

20  fee. CBS declined this offer.

21

22  **The Need to Dissolve FACBS**

23

24      20.    With the cessation of new retail membership program agreements and the failure of

25  the Wells Fargo Agreement, it is not reasonably practical for FACBS to carry on the business as

26  contemplated or in conformity with the Operating Agreement. For all intents and purposes the

27  business of FACBS has been abandoned.

28

-6-

**COMPLAINT**

PAYNE & FEARS LLP
ATTORNEYS AT LAW
4 PARK PLAZA, SUITE 1100
IRVINE, CALIFORNIA 92614
(949) 851-1100

21.     FAREISI and CBS have reached a state where they are deadlocked with respect to the management of FACBS and the management of FACBS is the subject of substantial internal dissension.

22.     Dissolution of FACBS is also reasonably necessary for the protection of the rights and interests of FAREISI.

### SECOND CAUSE OF ACTION
(FOR DECLARATORY RELIEF)

23.     FAREISI realleges and incorporates by reference paragraphs 1 through 22 inclusive, as though set forth in full.

24.     An actual controversy over FACBS exists between FAREISI and CBS, in that FAREISI contends that (1) FACBS should be dissolved, and (2) CBS must reimburse FAREISI for the losses it has advanced on behalf of FACBS, including the losses incurred in connection with the Wells Fargo Agreement.  FAREISI alleges that CBS makes contentions to the contrary.

25.     FAREISI requests a judicial declaration that FACBS be dissolved and that CBS must reimburse FAREISI for the losses it has advanced on behalf of FACBS, including the losses incurred in connection with the Wells Fargo Agreement.

### THIRD CAUSE OF ACTION
(FOR SPECIFIC PERFORMANCE)

26.     FAREISI realleges and incorporates by reference paragraphs 1 through 6 inclusive, as though set forth in full.

PAYNE & FEARS LLP
ATTORNEYS AT LAW
4 PARK PLAZA, SUITE 1100
IRVINE, CALIFORNIA 92614
(949) 851-1100

-7-

**COMPLAINT**

EXHIBIT A – PAGE 11

27.     On or about July 31, 2000, FAREISI and CBS, together with the shareholders of CBS, entered into a "Stock Purchase and Option Agreement" (the "Stock Purchase Agreement").  A true and correct copy of the Stock Purchase Agreement, together with its exhibits but without its schedules, is attached hereto as Exhibit "A" and incorporated by reference as though set forth in full.  Pursuant to the terms of the Stock Purchase Agreement, CBS sold to FAREISI, and FAREISI purchased from CBS, one hundred twelve (112) newly issued shares of CBS stock, manifested as CBS stock certificate No. 6 (the "FAREISI Shares") for a purchase price of $2,000,000, representing ten percent (10%) of the then issued and outstanding shares of common stock in CBS.  The purchase was made by a payment by FAREISI of $1,000,000 in cash and a note (the "FAREISI Note") in the sum of $1,000,000 payable to CBS.  The note is attached as Exhibit "A" to the Stock Purchase Agreement. FAREISI has timely made all payments due under the FAREISI Note.  A payment of $87,500.00 is due May 1, 2003, with the remaining principal amount due of $83,333.37.  As of May 1, 2003, a total of $170,833.37 in outstanding principal and accrued interest would be due.

28.     Among other things, CBS covenanted in the Stock Purchase Agreement that it would prepare and deliver financial statements for the calendar year 2002 to FAREISI not later than February 15, 2003 [¶5.6].   CBS failed to do so and as of the date of this complaint has not delivered such financial statements for the year 2002 to FAREISI.

29.     The Stock Purchase Agreement provided to FAREISI the option to purchase additional shares in CBS from the other shareholders under various circumstances during an "Exercise Period" for each calendar year.  The Stock Purchase Agreement provided that Exercise Period "is the period commencing on the date that FAREISI receives a copy of [CBS's] financial statements ("CBS Financial Statements") for the prior calendar year and ending 5 p.m. (Pacific Time) thirty (30) days after the date of such receipt." [¶2.3].  FAREISI has notified CBS in writing of its election not to exercise its option to purchase.  The Stock Purchase Agreement also provides, in pertinent part:

PAYNE & FEARS LLP
ATTORNEYS AT LAW
4 PARK PLAZA, SUITE 1100
IRVINE, CALIFORNIA 92614
(949) 851-1100

-8-

"2.7   Repurchase of Subject FAREISI Shares

2.7.1   Terms of Repurchase.  In the event that prior to the expiration of the Exercise Period for calendar year 2003, FAREISI has not then exercised all the FAREISI Options...FAREISI shall be required to sell to [CBS], and [CBS] shall be required to purchase from FAREISI, all, but not less than all, the Subject FAREISI Shares, at a price ("Repurchase Price") equal to Two Million Two Hundred Thousands Dollars ($2,200,000) less an amount equal to the amount of outstanding principal and accrued interest under the FAREISI Note, if any, as of the date of closing ("Repurchase Closing") of [CBS's] repurchase of the Subject FAREISI Shares pursuant to this Section 2.7. The Repurchase Price will be payable in twelve (12) quarterly installments of principal and interest.  The Company's obligation to pay the Repurchase Price shall be evidenced by its promissory note in the form attached as Exhibit B ("Company Note") and secured by a pledge of all the Subject FAREISI Shares pursuant to a stock pledge agreement containing customary provisions as agreed upon by the Company and FAREISI ("Stock Pledge Agreement")."

30.    FAREISI has fully performed all conditions, covenants and promises required to be performed on its part under the Stock Purchase Agreement and the FAREISI Note described herein, or has been excused from doing so by the actions or omissions of CBS. FAREISI has given notice to CBS of its intent not to exercise its options and made demand on CBS that CBS repurchase the shares owned by FAREISI pursuant to ¶2.7 of the Agreement.

31.    FAREISI is ready, willing and able to deliver the certificate(s) representing all the subject FAREISI shares to CBS, endorsed for transfer to CBS.  Pursuant to the terms of the Stock Purchase Agreement, CBS is now required to deliver to FAREISI (1) the Company Note in the form

-9-

**COMPLAINT**

PAYNE & FEARS LLP
ATTORNEYS AT LAW
4 PARK PLAZA, SUITE 1100
IRVINE, CALIFORNIA 92614
(949) 851-1100

of Exhibit "B" to the Stock Purchase Agreement in the principal sum of $2,029,166.63, payable in twelve (12) quarterly installments of principal and interest at the rate of 10% per annum, commencing on April 30, 2003; (2) the FAREISI Note marked cancelled; (3) the Stock Pledge Agreement provided for in paragraph 2.7.1 of the Stock Purchase Agreement; and (4) the certificates representing the subject FAREISI shares accompanied by a stock power in blank be delivered to FAREISI in order to secure the Company Note pursuant to the Stock Purchase Agreement.

32.   CBS has breached the Stock Purchase Agreement and its obligations thereunder by, among other things, failing and refusing to repurchase the FAREISI Shares as required by the Stock Purchase Agreement. As a result, FAREISI is entitled to specific performance of the repurchase provisions of the Stock Purchase Agreement as set forth herein, together with any damages incidental to such award.

33.   FAREISI has been required to retain counsel to enforce the Stock Purchase Agreement and as such is entitled to recover its attorneys' fees and costs incurred in this action as provided for in the Stock Purchase Agreement.

### FOURTH CAUSE OF ACTION
### (FOR BREACH OF CONTRACT)

34.   FAREISI realleges and incorporates by reference paragraphs 1 through 6 and 27 through 33 inclusive, as though set forth in full.

35.   FAREISI has fully performed all conditions, covenants and promises required to be performed on its part under the Stock Purchase Agreements described herein, or has been excused from doing so by the actions or omissions of CBS.

PAYNE & FEARS LLP
ATTORNEYS AT LAW
4 PARK PLAZA, SUITE 1100
IRVINE, CALIFORNIA 92614
(949) 851-1100

-10-

COMPLAINT

30, 2003; (2) the FAREISI Note marked cancelled; (3) the Stock Pledge Agreement provided for in paragraph 2.7.1 of the Stock Purchase Agreement; and (4) the certificates representing the subject FAREISI shares accompanied by a stock power in blank in order to secure the Company Note pursuant to the Stock Purchase Agreement.

5.    For damages incidental to the judgment for specific performance.

**On the Fourth Cause of Action:**

6.    For monetary damages in the sum of $2,029,166.63, plus interest at the rate of 10% per annum, commencing on April 30, 2003.

**On All Causes of Action:**

7.    For compensatory and special damages in an amount according to proof;

8.    For FAREISI's attorneys' fees in an amount according to proof;

9.    For FAREISI's costs of suit incurred herein, including attorneys' fees;

10.    For prejudgement interest at the maximum rate permitted by law; and

11.    For such further relief as the court may deem just and proper.

DATED: March 6, 2003

PAYNE & FEARS LLP
Daniel M. Livingston
Thomas L. Vincent

By: _____
        Daniel M. Livingston

Attorneys for Plaintiff FIRST AMERICAN REAL ESTATE INFORMATION SERVICES, INC.

201520.2

-12-

COMPLAINT

EXHIBIT A – PAGE 15

PAYNE & FEARS LLP
ATTORNEYS AT LAW
4 PARK PLAZA, SUITE 1100
IRVINE, CALIFORNIA 92614
(949) 851-1100

STOCK PURCHASE AND OPTION AGREEMENT

AMONG

FIRST AMERICAN REAL ESTATE INFORMATION SERVICES, INC.

**(FAREISI),**

CONSUMER BENEFIT SERVICES, INC.

**(COMPANY),**

AND

CBS SHAREHOLDERS

**(SHAREHOLDERS)**

Dated: July 31, 2000

**EXHIBIT A – PAGE 17**

## TABLE OF CONTENTS

## ARTICLE 1

## PURCHASE AND SALE OF INITIAL FAREISI SHARES

| | | |
|---|---|---|
| 1.1 | Purchase and Sale of Initial FAREISI Shares | 2 |
| 1.2 | Closing of Purchase of Initial FAREISI Shares | 2 |
| 1.3 | Transfer Taxes | 3 |

## ARTICLE 2

## FAREISI OPTIONS

| | | |
|---|---|---|
| 2.1 | Grant of FAREISI Options | 3 |
| 2.2 | HUB Acquisition | 4 |
| | 2.2.1 Subsequent Execution of Agreement by HUB Shareholder | 4 |
| | 2.2.2 New Shares | 4 |
| 2.3 | Exercise Period | 5 |
| 2.4 | Exercise Requirements | 5 |
| 2.5 | Exercise Price | 6 |
| 2.6 | Issuance of FAC Shares | 8 |
| | 2.6.1 Valuation | 8 |
| | 2.6.2 Registration of Shares | 8 |
| 2.7 | Repurchase of Subject FAREISI Shares | 9 |
| | 2.7.1 Terms of Repurchase | 9 |
| | 2.7.2 Transfer Taxes | 10 |
| 2.8 | Option Closings | 10 |
| 2.9 | Transfer Taxes | 11 |
| 2.10 | Representations and Warranties | 11 |
| | 2.10.1 Capacity; Binding Obligation | 11 |
| | 2.10.2 No Consent | 12 |
| | 2.10.3 No Actions | 12 |
| | 2.10.4 No Encumbrances or Restrictive Agreements | 12 |
| | 2.10.5 Title | 13 |
| 2.11 | Legends | 13 |

## ARTICLE 3

## REPRESENTATIONS AND WARRANTIES OF MARTORANO, SEFTON, AND THE COMPANY

| | | |
|---|---|---|
| 3.1 | Organization, Good Standing, Etc | 14 |

fareisi.cbspurchaseagreemen 10.doc

3.2     Authorization ...................................................................................14
3.3     Execution and Delivery; Enforceability.............................................14
3.4     No Contravention.............................................................................15
3.5     No Consent or Regulatory Approvals................................................15
3.6     Capitalization ..................................................................................15
        3.6.1   Capital Stock.......................................................................15
        3.6.2   Options...............................................................................16
        3.6.3   No Violation of Rights; No Restrictive Agreements .............16
        3.6.4   Subject FAREISI Shares......................................................16
3.7     Subsidiaries, Etc...............................................................................16
3.8     Financial Statements.........................................................................17
3.9     Absence of Undisclosed Liabilities....................................................17
3.10    No Shareholder Claims......................................................................17
3.11    Absence of Certain Changes or Events...............................................17
3.12    Tax Matters .....................................................................................18
        3.12.1  Definition of Taxes .............................................................18
        3.12.2  Tax Matters .......................................................................19
3.13    Real Property ...................................................................................19
3.14    Personal Property..............................................................................20
3.15    Material Contracts.............................................................................20
3.16    Employee Matters.............................................................................22
        3.16.1  Collective Bargaining Agents and Labor Relations...............22
        3.16.2  Compliance With Labor Laws ..............................................23
        3.16.3  Employment Contracts.........................................................23
        3.16.4  Employee Benefit Plans........................................................23
3.17    Litigation..........................................................................................24
3.18    Insurance ........................................................................................25
3.19    Compliance with Laws .....................................................................25
3.20    Licenses, Permits, and Authorizations...............................................25
3.21    Environmental Matters......................................................................26
3.22    Intellectual Property..........................................................................27
        3.22.1  General...............................................................................27
        3.22.2  Software and Hardware........................................................27
        3.22.3  No Infringement..................................................................28
        3.22.4  Patents...............................................................................29
        3.22.5  Confidentiality Agreements .................................................29
3.23    Open Orders.....................................................................................29
3.24    Accounts Receivable.........................................................................29
3.25    Quality of Products and Services .......................................................30
3.26    Indebtedness.....................................................................................30
3.27    Royalties and Commissions...............................................................30
3.28    Related Party Transactions ...............................................................30
        3.28.1  General...............................................................................30
        3.28.2  Software License.................................................................31
3.29    Completeness of Documents.............................................................32
3.30    Books and Records ..........................................................................32

faresi.cbspurchaseagreemen 10.doc

EXHIBIT A – PAGE 19

3.31    No Brokers ........................................................................32
3.32    Disclosure .........................................................................33

# ARTICLE 4

# REPRESENTATIONS AND WARRANTIES OF FAREISI

4.1    Organization...................................................................33
4.2    Authorization ..................................................................33
4.3    Execution and Delivery; Enforceability..............................34
4.4    No Contravention.............................................................34
4.5    No Consents or Regulatory Approvals ..............................34
4.6    No Brokers .....................................................................34
4.7    Purchase for Own Account ..............................................34

# ARTICLE 5

# COVENANTS

5.1    Hart-Scott-Rodino Act ...................................................35
5.2    FAREISI Directorship .....................................................35
5.3    Negative Covenants of Company ......................................35
5.4    Exclusive Dealing ...........................................................37
5.5    Due Diligence .................................................................38
5.6    Affirmative Covenants of Company...................................39
5.7    Assignment of Affiliate Software .....................................39

# ARTICLE 6

# CONDITIONS OF PURCHASES OF SHARES

6.1    Conditions Precedent to Obligations of FAREISI, Company,
         and CBS Shareholders ....................................................40
         6.1.1    Regulatory Approvals ...........................................40
         6.1.2    No Injunctions.....................................................40
         6.1.3    Other Documents ................................................40
6.2    Conditions Precedent to Obligations of FAREISI ...............40
         6.2.1    Representations, Warranties, and Covenants..........41
         6.2.2    No Claims ...........................................................41
         6.2.3    Initial Shares Closing..........................................41
                   6.2.3.1    Required Consents and Certificates ........41
                   6.2.3.2    Legends ..............................................42
6.3    Conditions Precedent to Obligations of Company and
         CBS Shareholders...........................................................42

faresi.cbspurchaseagreemen 10.doc

EXHIBIT A – PAGE 20

6.3.1      FAC Shares ...........................................................43

# ARTICLE 7

# CLAIMS AND RELATED MATTERS

7.1    Survival ............................................................44
7.2    Damages..........................................................44
7.3    Indemnification by CBS Shareholders............................................45
7.4    Indemnification by the Company......................................45
7.5    Indemnification by FAREISI ............................................45

# ARTICLE 8

# OTHER MATTERS

8.1    Notices, Etc ............................................................45
8.2    Amendments and Waiver......................................................46
8.3    Expenses .....................................................46
8.4    Headings ............................................................47
8.5    Pronouns; Number ......................................................47
8.6    Interpretation.........................................................47
8.7    Counterparts ....................................................47
8.8    Parties in Interest; Assignment ...........................................47
8.9    Recitals, Schedules, and Exhibits ...............................48
8.10   Equitable Remedies ...............................................48
8.11   Entire Agreement...................................................48
8.12   Legal Invalidity........................................................48
8.13   Attorney Fees ....................................................49
8.14   Governing Law ....................................................49
8.15   Form of Public Disclosures......................................49
8.16   Cumulative Rights and Remedies......................................49
8.17   No Third-Party Beneficiaries..............................................49

faresi.cbspurchaseagreemen 10.doc

## EXHIBITS

Exhibit A......................................................................Form of FAREISI Note

Exhibit B ...................................................................Form Company Note

Exhibit C ...................................................................Form of Legend

## SCHEDULES

Schedule 2.5    ............................................................Adjustments to EBITDA

Schedule 2.10.4.........................................................Restrictive Agreements

Schedule 2.10.5.........................................................Ownership of Common Stock

Schedule 3.5    ............................................................Required Consents

Schedule 3.7    ............................................................Subsidiaries

Schedule 3.8    ............................................................Financial Statements

Schedule 3.9    ............................................................Undisclosed Liabilities

Schedule 3.11 ............................................................Certain Events

Schedule 3.13 ............................................................Real Property Leases

Schedule 3.14 ............................................................Personal Property

Schedule 3.15 ............................................................Material Contracts

Schedule 3.16.2.........................................................Employee Claims

Schedule 3.16.3......................................................... Employment Agreements; Highly
                                                                  Compensated Employees

Schedule 3.16.4.........................................................Employee Benefit Plans

Schedule 3.18 ............................................................Insurance

Schedule 3.20 ............................................................Licenses and Permits

Schedule 3.22.1.........................................................Intellectual Property

Schedule 3.22.5.........................................................Confidentiality Agreements

Schedule 3.23 ............................................................Open Orders

Schedule 3.24 ............................................................Accounts Receivable

Schedule 3.26 ............................................................Indebtedness

Schedule 3.27 ............................................................Royalties and Commissions

Schedule 3.28 ............................................................Related party Transactions

v

faresi.cbspurchaseagreemen 10.doc

# STOCK PURCHASE AND OPTION AGREEMENT

**THIS STOCK PURCHASE AND OPTION AGREEMENT** ("Agreement") dated as of July 31, 2000, is entered into by and among (1) First American Real Estate Information Services, Inc., a California corporation ("**FAREISI**"), (2) Consumer Benefit Services, Inc., an Illinois corporation ("**Company**"), and (3) Michael Martorano ("**Martorano**") and William Sefton ("**Sefton**").

## RECITALS

A.    The Company's authorized capital stock consists solely of one hundred thousand (100,000) shares of common stock, $1.00 par value per share ("**Common Stock**").

B.    There are a total of one thousand (1,000) issued and outstanding shares of Common Stock, of which Martorano owns five hundred (500) shares and Sefton owns five hundred (500) shares.

C.    The Company is negotiating the acquisition of HUB Travel Agency ("**HUB**"). If the Company's acquisition of HUB ("**HUB Acquisition**") is completed, it is anticipated that the Company will issue sixty (60) newly issued shares of Common Stock ("**HUB Shares**") to Richard Jennison ("**HUB Shareholder**") in exchange for all the issued and outstanding shares of capital stock of HUB.

D.    The parties wish to enter into a series of related transactions pursuant to which (1) the Company will sell one hundred twelve (112) newly issued shares of Common Stock ("**Initial FAREISI Shares**") to FAREISI; (2) the Company will issue to Martorano and Sefton each an additional four (4) shares of Common Stock (so that each will then own five hundred four (504) shares of Common Stock), (3) Martorano and Sefton will each grant FAREISI options to

1

faresi.cbspurchaseagreemen 10.doc

purchase all their shares of Common Stock; and (3) if the HUB Acquisition is consummated, the Company will issue to FAREISI, without charge, an additional eight (8) newly issued shares of Common Stock (so that FAREISI will then own a total of one hundred twenty (120) shares of Common Stock), the HUB Shareholder will be issued sixty (60) newly issued shares of Common Stock, and Martorano and Sefton will each be issued an additional six (6) shares newly issued shares of Common Stock (so that each will then own five hundred ten (510) shares of Common Stock) and, (4) the HUB Shareholder will become a party to this Agreement and grant FAREISI an option to acquire all his HUB Shares.

## AGREEMENT

In consideration of the foregoing, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto represent, warrant, covenant, and agree as follows:

### ARTICLE 1

### PURCHASE AND SALE OF INITIAL FAREISI SHARES

1.1    Purchase and Sale of Initial FAREISI Shares. In accordance with the terms, and subject to the satisfaction of the conditions, contained in this Agreement, the Company will sell to FAREISI, and FAREISI will purchase from the Company one hundred twelve (112) newly issued shares of Common Stock for a purchase price of Two Million Dollars ($2,000,000), payable as described in Section 1.2; it being agreed that the Initial FAREISI Shares will total ten (10) percent of the issued and outstanding shares of Common Stock.

1.2    Closing of Purchase of Initial FAREISI Shares.  The closing of FAREISI's purchase of the Initial FAREISI Shares ("**Initial FAREISI Shares Closing**") shall be held

2

concurrently with the execution and delivery of this Agreement by FAREISI, the Company, Martorano, and Sefton ("**Initial FAREISI Shares Closing Date**"). At the Initial FAREISI Shares Closing, (1) FAREISI shall wire to a deposit account designated by the Company the sum of One Million Dollars ($1,000,000) in immediately available funds, (2) FARESI shall deliver to the Company FAREISI's promissory note, in initial principal amount of One Million Dollars ($1,000,000) and in the form of note attached as Exhibit A ("**FAREISI Note**"), (3) the Company shall deliver to FAREISI a certificate representing one hundred twelve (112) newly issued shares of Common Stock registered in FAREISI's name, and (4) the parties to the Initial FAREISI Shares Closing shall deliver the other documents and take the other actions contemplated in this Agreement.

      1.3    Transfer Taxes. All federal, state, and local transfer, stamp, and other taxes (together, "**Transfer Taxes**") in connection with the sale to, and purchase by, FAREISI of the Initial FARESI Shares, if any, will be borne by the Company. The Company shall be responsible for filing all necessary returns and other documentation with respect to all Transfer Taxes, and, if required by applicable law, FAREISI will join in the execution of such returns and other documentation. The Company will provide FAREISI with a copy of any filing made in connection with such Transfer Taxes at least thirty (30) days before filing, and will make any changes reasonably requested by FAREISI.

## ARTICLE 2

## FAREISI OPTIONS

      2.1    Grant of FAREISI Options. Martorano and Sefton each hereby grants FAREISI the irrevocable and exclusive option to purchase all the shares of Common Stock now owned by him or acquired by him at any time after the date of this Agreement, (or any lesser amount for

faresi.cbspurchaseagreemen 10.doc

which such options may be exercised from time to time) (each, a "**FAREISI Option**") on the terms and conditions contained in this Article 2. The FAREISI Options include, without limitation, any shares of Common Stock acquired by Martorano or Sefton pursuant to the terms of the Consumer Benefit Services, Inc. Stockholders' Agreement dated as of January 1, 2000 ("**Stockholders' Agreement**") between Martorano and Sefton.

2.2    HUB Acquisition.

2.2.1    Subsequent Execution of Agreement by HUB Shareholder. The Company, Martorano, and Sefton each agrees that no HUB Shares will be issued to the HUB Shareholder, and the HUB Shareholder will not be granted any right to acquire any HUB Shares, unless, as part of the closing of the HUB Acquisition, the HUB Shareholder has become a party to this Agreement by executing a signature page hereto. At such time, upon execution of such agreements, HUB will be a "**Subsidiary**" (as defined in Section 3.7) and the HUB Shareholder shall be a CBS Shareholder for all purposes of this Agreement, and the HUB Shareholder shall be deemed to have granted FAREISI a FAREISI Option on all his HUB Shares, identical to those granted by Martorano and Sefton pursuant to Section 2.1. For purposes of this Agreement, Martorano, Sefton, and, if the HUB Shares are issued, the HUB Shareholder, are sometimes referred to herein, collectively, as the "**CBS Shareholders.**" Concurrently with the execution of this Agreement by the HUB Shareholder, the appropriate schedules to this Agreement shall be amended to reflect HUB's status as a Subsidiary, the HUB Shares, and the new CBS Shareholder.

2.2.2    New Shares. In order to prevent dilution as a result of the HUB Acquisition, the Company will issue four (4) newly issued shares of Common Stock to Martorano and four (4) newly issued shares of Common Stock to Sefton (or a total of eight (8)

4

faresi.cbspurchaseagreemen 10.doc

shares) and eight (8) newly issued shares of Common Stock to FAREISI, without charge, concurrently with the closing of the HUB Acquisition. For purposes of this Agreement, the one hundred twelve (112) Initial FAREISI Shares and the eight (8) additional shares of Common Stock issued to FAREISI in connection with the HUB Acquisition are sometimes referred to, together, as the " **Subject FAREISI Shares**."

2.3    <u>Exercise Period</u>. The FAREISI Options are exercisable, in whole or in one or more parts, by FAREISI in calendar years 2001, 2002, and 2003, but only during the Exercise Period for the applicable calendar year. The period during calendar years 2001, 2002, and 2003 during which FAREISI may exercise the FAREISI Options (each, an "**Exercise Period**") is the period commencing on the date that FAREISI receives a copy of the Company's financial statements ("**CBS Financial Statements**") for the prior calendar year and ending 5 p.m. (Pacific Time) thirty (30) days after the date of such receipt. The CBS Financial Statements shall consist of unaudited consolidated balance sheet, income statement, statement of cash flows, and statement of changes in shareholders' equity of the Company and each of its Subsidiaries at the end of such calendar year and for the twelve (12) month-period then ended, and shall be prepared in accordance with generally accepted accounting principles ("**GAAP**"), consistently applied, and shall exclude any extraordinary or unusual items, <u>subject, however</u>, to the adjustments set forth on <u>Schedule 2.5</u>.

2.4    <u>Exercise Requirements</u>. In order to exercise the FAREISI Options, in whole or part, FAREISI must give written notice of the exercise to the CBS Shareholders and the Company prior to the expiration of the applicable Exercise Period ("**Exercise Notice**"). In order to make any exercise of the FAREISI Options, FAREISI must concurrently exercise all the FAREISI Options ratably, so that the total number of shares of Common Stock acquired by

faresi.cbspurchaseagreemen 10.doc

FAREISI pursuant to such exercise is allocated pro rata among all the CBS Shareholders. With respect to any Exercise Period, if the CBS Shareholders holding at least fifty-one (51) percent of the issued and outstanding shares of Common Stock not then owned by FAREISI ("**Majority Other Shareholders**") provide written notice to FAREISI, within ten (10) days after their receipt of the Exercise Notice, that they do not want the FAREISI Options to be exercised at such time, FAREISI's exercise for that year shall be void and without effect ("**Avoidance Right**"). Subject to the Avoidance Rights, there is no limitation on the number of shares of Common Stock that FAREISI may acquire in any calendar year pursuant to exercises the FAREISI Options. Any portion of the FAREISI Options that have not been exercised prior to the expiration of the Exercise Period for calendar year 2003 shall expire and be without any further force or effect. In addition, if the Majority Other Shareholders exercise their Avoidance Right with respect to the Exercise Period for calendar year 2003, all outstanding FAREISI Options shall expire and be without any further force or effect.

2.5   Exercise Price.  If FAREISI exercises FAREISI Options during an Exercise Period, FAREISI and the Majority Other Shareholders have not exercised their Avoidance Right with respect to such exercise, the CBS Shareholders will have a period of sixty (60) days from the date of the Exercise Notice with respect to such exercise ("**Pricing Period**") to agree upon the exercise price ("**Exercise Price**") for the shares of Common Stock subject to such exercise. The Exercise Price may be paid in cash, shares of The First Financial Corporation's common stock ("**FAC Shares**"), or a combination thereof, as is agreed upon by FAREISI and the Majority Other Shareholders. If, prior to the expiration of the Pricing Period, FAREISI and Majority Other Shareholders are not able to agree upon the Exercise Price or the form of consideration to be paid with respect to such exercise of the FAREISI Options, FAREISI shall

6

**EXHIBIT A – PAGE 28**

have no right to acquire any shares of Common Stock pursuant to such exercise. Without limiting the right of the parties to negotiate the Exercise Price during the Pricing Period should they decide to do so, FAREISI and the CBS Shareholders agree to negotiate such price in good faith, with the understanding that the Exercise Price will be an amount equal to the product of the **Per Share Price** (as defined below) and the number of shares of Common Stock subject to the FAREISI Options then exercised, unless there are special circumstances that would make such Exercise Price unfair. For purposes of determining the Exercise Price with respect to an exercise of FAREISI Options, the **"Per Share Price"** means the amount, rounded to four decimal places, equal to (a) the product of (i) the Company's consolidated net income after federal and state taxes for the 12-month period ended December 31 during the calendar year immediately prior to the calendar year in which such FAREISI Options were exercised as derived from the CBS Financial Statements for the applicable year, adjusted as provided in <u>Schedule 2.5</u>, (**"Adjusted ATNI"**), (ii) multiplied by the **"Multiple"** set forth below, (b) divided by the total number of shares of Company Stock issued and outstanding at the date of the exercise. Adjusted ATNI will be computed based on estimated federal and Illinois state tax rates for the calendar year in which the closing of the purchase of the shares of Common Stock pursuant to such exercise occurs, as agreed upon by FAREISI and the Majority Other Shareholders. Such estimate shall be based on existing federal and state regulations and guidelines, and shall be determined in a manner consistent with the Company's tax reporting in CBS Financial Statements for the calendar year prior to the year in which the exercise occurs.

| Adjusted ATNI | Multiple |
|---|---|
| Less than $1 MM | 15 |
| $1 MM to $2 MM | 20 |
| Over $2 MM | 25 |

faresi.cbspurchaseagreemen 10.doc

2.6     Issuance of FAC Shares.

2.6.1   Valuation.  In the event that FAREISI and the Majority Other

Shareholders agree that some or all of an Exercise Price will consist wholly or in part of FAC

Shares, for the purpose of determining the number of FAC Shares to be paid in such Exercise

Price, each FAC Share to be paid as part of such Exercise Price shall be valued based on the

average price for one FAC Share as reported on the New York Stock Exchange during the period

of ten (10) consecutive trading days ended three (3) trading days prior to the date of the Exercise

Notice with respect to such exercise ("**Average Price**"), subject to the "collar" adjustment

described below. For the purpose of such adjustment, (a) the **"Base Price"** of one FAC Share is

the amount agreed upon by FAREISI and the Majority Other Shareholders during the Pricing

Period, (b) the **"Ceiling Price"** means an Average Price of one FAC Share that is at least ten (10)

percent more than the Base Price, and (c) the **"Floor Price"** means an Average Price of one FAC

Share that is at least ten (10) percent less than the Base Price. In the event the Average Price of

one FAC Share equals or exceeds the Ceiling Price, each FAC Share included in the Exercise

Price shall be valued at the Ceiling Price, and in the event the Average Price of one FAC Share is

equal to or less than the Floor Price, each FAC Share included in the Exercise Price shall be

valued at the Floor Price.

2.6.2   Registration of Shares. All FAC Shares issued to CBS Shareholders in

connection with the Exercise Price shall be registered under the Securities Act of 1933, as

amended ("**Securities Act**"), the rules of the Securities Exchange Commission ("**SEC**")

thereunder, and applicable state securities laws, and will be freely tradable under such laws by

the CBS Shareholders who receive such shares in such transaction.

faresi.cbspurchaseagreemen 10.doc

2.7   Repurchase of Subject FAREISI Shares.

   2.7.1   Terms of Repurchase.   In the event that prior to the expiration of the

Exercise Period for calendar year 2003, FAREISI has not then exercised all the FAREISI

Options or, if FAREISI has exercised such options during the Exercise Period for calendar year

2003, but FAREISI and the Majority Other Shareholders have not reached an agreement as to the

form and amount of the Exercise Price prior to the expiration of the Pricing Period for such

exercise, FAREISI shall be required to sell to the Company, and the Company shall be required

to purchase from FAREISI, all, but not less than all, the Subject FAREISI Shares, at a price

("**Repurchase Price**") equal to Two Million Two Hundred Thousand Dollars ($2,200,000) less

an amount equal to the amount of outstanding principal and accrued interest under the FAREISI

Note, if any, as of the date of closing ("**Repurchase Closing**") of the Company's repurchase of

the Subject FAREISI Shares pursuant this Section 2.7.  The Repurchase Price will be payable in

twelve (12) quarterly installments of principal and interest.  The Company's obligation to pay the

Repurchase Price shall be evidenced by its promissory note in the form attached as Exhibit B

("**Company Note**") and secured by a pledge of all the Subject FAREISI Shares pursuant to a

stock pledge agreement containing customary provisions as agreed upon by the Company and

FAREISI ("**Stock Pledge Agreement**").  The Repurchase Closing shall occur at a location

mutually convenient to the parties on a date not later than thirty (30) days after the date all the

FAREISI Options have expired without exercise or, if applicable, the Pricing Period for calendar

year 2003 has expired without agreement by the parties as to the Exercise Price ("**Repurchase**

**Closing Date**").  At the Repurchase Closing, (a) FAREISI shall deliver the certificates

representing all the Subject FAREISI Shares to the Company, endorsed for transfer to the

Company, and (b) the Company shall deliver to FAREISI (i) the Company Note, (ii) the

FAREISI Note marked cancelled (if not already paid in full), and (iii) the Stock Pledge Agreement, and (c) the Company will redeliver the certificates representing the Subject FAREISI Shares to FAREISI accompanied by a stock power in blank in order to secure the Company Note pursuant to the Stock Pledge Agreement. FAREISI shall transfer the Subject FAREISI Shares to the Company without any representations or warranties, other than the limited warranties that FAREISI has valid title to such shares and that such shares are not subject to any security interest or lien created by FAREISI.

2.7.2   Transfer Taxes. All Transfer Taxes in connection such repurchase transaction, if any, will be borne by the FAREISI. FAREISI shall be responsible for filing all necessary returns and other documentation with respect to all Transfer Taxes, and, if required by applicable law, the Company will join in the execution of such returns and other documentation. FAREISI will provide the Company with a copy of any filing made in connection with such Transfer Taxes at least thirty (30) days before filing, and will make any changes reasonably requested by the Company.

2.8   Option Closings. The closing of each exercise of FAREISI Options shall occur on (a) the later of (i) fifteen (15) days after the expiration of the applicable Pricing Period, and (ii) fifteen (15) days after all closing conditions have been satisfied, or (b) any other date mutually agreed upon in writing by FAREISI and the Majority Other Shareholders at a location mutually convenient to the parties. At such closing, FAREISI shall deliver the Exercise Price of all the FAREISI Options it has exercised in such transaction to the CBS Shareholders according to their respective interests, the CBS Shareholders shall deliver their certificates representing the appropriate number of shares of Common Stock to the Company, duly endorsed for transfer or accompanied by a stock power in blank, for reissuance to FAREISI, the Company shall deliver

10

faresi.cbspurchaseagreemen 10.doc

to FAREISI a new certificate representing the shares of Common Stock that FAREISI has acquired pursuant to such exercise, and, if applicable, the Company shall deliver to each CBS Shareholder a new certificate representing any remaining shares of Common Stock included in the certificate(s) delivered to the Company by such shareholder for reissuance as provided above. In addition, each CBS Shareholder will deliver a written instrument to FAREISI, in form and substance satisfactory to FAREISI, stating that each of his representations and warranties contained in Section 2.10 are true and correct as of the date of such closing, with the same force and effect as if made on such date.

2.9     Transfer Taxes.  All Transfer Taxes, if any, due in connection with the sale and purchase of the shares of Common Stock acquired by FAREISI pursuant to exercises of FAREISI Options shall be borne by the CBS Shareholders pro rata.  The CBS Shareholders will be responsible for filing all necessary returns and other documentation with respect to all Transfer Taxes, and if required by applicable law, FAREISI will join in the execution of such returns and other documentation.  The CBS Shareholders will provide copies of any filings made in connection with such Transfer Taxes to FAREISI at least thirty (30) days prior to filing, and shall make any changes reasonably requested by FAREISI.

2.10    Representations and Warranties.  In order to induce FAREISI to enter into this Agreement and to exercise the FAREISI Options, each CBS Shareholder makes the representations and warranties to FAREISI set forth below, both as of the date of such shareholder's execution of this Agreement and as of the date of each closing of each exercise by FAREISI of the FAREISI Option granted by such shareholder.

2.10.1  Capacity; Binding Obligation.  The CBS Shareholder has the full right, power, and legal capacity to enter into this Agreement and perform his obligations under this

11

EXHIBIT A – PAGE 33

Agreement, and this Agreement constitutes the legal and binding obligations of the CBS Shareholder, enforceable against him in accordance with its terms, subject to the effect of bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or affecting the rights of creditors ("**Creditor Rights Laws**") and general principles of equity, regardless of whether such enforcement is considered a proceeding in law or equity ("**Equitable Principles**").

2.10.2  No Consent. Subject to compliance with the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the regulations of the Federal Trade Commission thereunder (together "**Hart-Scott-Rodino Act**"), to the extent applicable, no consent of any individual, entity, or governmental authority is necessary for the CBS Shareholder to perform his obligations pursuant to this Article 2, including, without limitation, to transfer the shares of Common Stock to FAREISI subject to FAREISI's exercise of the FARESI Option he has granted hereunder.

2.10.3  No Actions.  There is no legal or administrative action pending, or to the CBS Shareholder's knowledge, threatened, that could be reasonably expected to affect the FAREISI Option granted by such shareholder hereunder or FAREISI's right to acquire the shares of Common Stock subject to such option.

2.10.4  No Encumbrances or Restrictive Agreements.  Except for the rights of Martorano and Sefton pursuant to the Stockholders' Agreement, no person (other than FAREISI) pursuant to this Agreement has any right to acquire any of the shares of Common Stock subject to the FAREISI Option granted by such CBS Shareholder, and none of such shares is subject to (a) any security interest, lien, mortgage, pledge, trust arrangement, adverse claim, or other encumbrance (collectively "**Encumbrances**") created or suffered by the CBS Shareholder, except for the rights granted to FAREISI pursuant to this Agreement, or (b) any shareholder

12

agreements, voting rights, buy-sell agreement, or other agreement with respect to the capital stock of the Company or any Subsidiary (collectively, "**Restrictive Agreements**") entered into by such CBS Shareholder, except for the Restrictive Agreements listed in Schedule 2.10.4.

2.10.5 Title. The CBS Shareholder owns all the shares of Common Stock indicated in Schedule 2.10.5 (including any amendment to such schedule to reflect the additional shares of Common Stock issued in connection with the HUB Acquisition, as described in Section 2.2). Upon each exercise by FAREISI of its FAREISI Option on such shareholder's shares and payment of the applicable Exercise Price and delivery of the certificates representing the shares of Common Stock acquired by FAREISI pursuant to such exercise to the Company for reissuance to FAREISI as described in Section 2.8, FAREISI will receive valid legal title to such shares, free of all Encumbrances created or suffered by such shareholder and any Restrictive Agreements entered into by such shareholder, including, without limitation, the Stockholders' Agreement.

2.11 Legends. On or before the Initial FAREISI Shares Closing Date, Martorano and Sefton will each deliver the certificates representing all the shares of Common Stock they own to the Company, and the Company will place a legend on such certificates reflecting FAREISI's rights under this Article 2 in the form of legend contained in Exhibit C. In addition, the Company covenants that the certificates evidencing any HUB Shares it issues and any replacement certificate it issues to Martorano, Sefton, or the HUB Shareholder will contain the same legend. All such legends will remain on such certificates through the end of the Restricted Period (as defined in Section 5.3).

13

## ARTICLE 3

## REPRESENTATIONS AND WARRANTIES OF
## MARTORANO, SEFTON, AND THE COMPANY

Martorano, Sefton, and the Company jointly and severally represent and warrant to FAREISI as of the Initial FAREISI Shares Closing Date as follows:

3.1     Organization, Good Standing, Etc. The Company and each of its Subsidiaries is a corporation, duly incorporated and organized, validly existing, and in good standing under the laws of the state of Illinois; each has all requisite power and authority, corporate and other, to own and operate the properties and assets, and to lease the leased properties used, in its business, and to carry on its business as presently conducted; and each has carried on no business and operated no property or other assets of any nature as would require its qualification or licensing as a foreign corporation in any jurisdiction. Copies of the charter documents of the Company and each Subsidiary, and all amendments thereto, as amended to date, have been delivered to FAREISI and are complete and correct.

3.2     Authorization. The Company has all requisite corporate power and authority to execute, deliver, and perform its obligations under this Agreement. This Agreement and the transactions contemplated therein have been duly authorized and approved by the Company in accordance with all applicable state laws and its articles of incorporation and bylaws. No other corporate action on the part of the Company is required for it to execute, deliver, and perform this Agreement.

3.3     Execution and Delivery; Enforceability. This Agreement has been duly executed and delivered by the Company, and constitutes the valid and binding agreement of the Company,

faresi.cbspurchaseagreemen 10.doc

and is enforceable against it in accordance with its terms, subject to the effect of Creditor Rights Laws and Equitable Principles.

3.4   <u>No Contravention</u>. The execution, delivery, and performance by the Company of this Agreement do not conflict with, contravene, violate, or constitute an event of default under, create any Encumbrances on any of the assets or properties of the Company or any Subsidiary, result in a breach of, or require any notice to be given under, any provision of the articles of incorporation or bylaws of the Company or any Subsidiary, or violate any law or regulation applicable to it or any contract or agreement, judgement, injunction, order, decree, or other instrument to which the Company or any Subsidiary is a party or by which it is bound.

3.5   <u>No Consents or Regulatory Approvals.</u>  Except for the consents listed on Schedule 3.5 (**"Required Consents"**), no consent of, approval by, filing with, or notice to any governmental authority or any other person is required for the Company, Martorano, or Sefton to execute, deliver, and perform this Agreement.  All of the Required Consents have been obtained on terms that are not materially disadvantageous to the Company.

3.6   <u>Capitalization</u>.

3.6.1   <u>Capital Stock</u>.  As of the date of this Agreement, the authorized capital stock of the Company consists of one hundred thousand (100,000) shares of common stock, $1.00 par value per share, of which one thousand (1,000) shares are issued and outstanding. All of the shares of Common Stock issued and outstanding as of the date of this Agreement are owned as set forth in Schedule 2.10.5.  Such shares constitute all the issued and outstanding shares of capital stock of the Company as of the date of this Agreement. All such shares have been duly authorized, are validly issued, fully paid, and nonassessable, and have been issued in compliance with all applicable federal and state securities and corporate laws.

15

3.6.2   Options. As of the date of this Agreement, there are no outstanding options, warrants, conversion rights, or any other rights granted by the Company or any Subsidiary pursuant to which any shares of capital stock or other equity interest in such person may acquire any (except pursuant to this Agreement).

3.6.3   No Violation of Rights; No Restrictive Agreements.  None of the Company's or any Subsidiary's issued and outstanding shares of capital stock has been issued in violation of any preemptive or any other rights of any person.  Neither the Company nor any Subsidiary has any obligation pursuant to any agreement or understanding to repurchase, redeem, or otherwise acquire any outstanding shares of its capital stock, and no shares of the Company's or any Subsidiary's capital stock are subject to any Restrictive Agreements to which the Company or any Subsidiary is a party, except for the Restrictive Agreements listed on Schedule 2.10.4.

3.6.4   Subject FAREISI Shares. On issuance of the Initial FAREISI Shares, and on issuance of the additional shares of Common Stock to FAREISI as described in Section 2.2, (a) all such shares will be duly authorized, validly issued, fully paid, and nonassessable, free of all preemptive rights, (b) FAREISI will acquire valid legal title to all such shares, and (c) none of such shares will be subject to any Encumbrance or Restrictive Agreement, except for the restrictions contained in Section 4.7.

3.7   Subsidiaries, Etc. As of the date of this Agreement, all the Company's wholly owned subsidiaries are listed on Schedule 3.7 ("**Subsidiaries**").  If the HUB Acquisition is completed, HUB will, as of the closing of such transaction, be a Subsidiary for all purposes hereof.  Except for the Subsidiaries listed on Schedule 3.7, the Company does not now own, and

16

faresi.cbspurchaseagreement 10.doc

has never owned, directly or indirectly, any capital stock or other equity, proprietary, or other ownership interest in any corporation, partnership, joint venture, or other entity.

3.8  Financial Statements.  Schedule 3.8 contains the unaudited consolidated financial statements of the Company and the Subsidiaries for the calendar years ended 1997, 1998, and 1999 and for the first five (5) months of calendar year 2000 compiled by the Company's management from the books and records of the Company and the Subsidiaries.  The Financial Statements, for each period referred to above, include a consolidated balance sheet and related statement of income, and fairly represent, in all material respects, the consolidated financial position and results of operations of the Company and the Subsidiaries at and for the periods indicated.

3.9  Absence of Undisclosed Liabilities.  Except as set forth on Schedule 3.9, as of the date of this Agreement, neither the Company nor any Subsidiary has any liability or obligation (whether absolute, accrued, or contingent), which is not accrued or reserved against in the financial statements attached as Exhibit 3.8, except for those that, in the aggregate, are not material to the financial condition of the Company.

3.10  No Shareholder Claims.  There are no pending or, to the knowledge of the Company, Martorano, and Sefton, threatened claims against the Company or any Subsidiary by any CBS Shareholder.

3.11  Absence of Certain Changes or Events.  Except as disclosed on Exhibit 3.11, since December 31, 1999, through the date of this Agreement, except for the transactions contemplated in this Agreement, the business of the Company and the Subsidiaries has been conducted in the ordinary course, consistent with past practice, and since such date neither Company nor any Subsidiary has (whether absolute, accrued, fixed, contingent, liquidated,

17                    faresi.cbspurchaseagreemen 10.doc

EXHIBIT A – PAGE 39

unliquidated, or otherwise and whether due or to become due), except in the ordinary course of business consistent with past practices, (a) permitted any of its assets to be subjected to any Encumbrance, (b) sold, transferred, or otherwise disposed of any assets, except in the ordinary course of business consistent with past practices, (c) redeemed, purchased, or otherwise acquired any shares of its capital stock or other equity interests, (d) granted or issued any option, warrant, or other right to purchase or acquire any shares of its capital stock or other equity interest, (e) made any bonus or profit sharing distribution or payment of any kind, (f) materially increased its indebtedness for borrowed money or made any loan to any person, (g) wrote off as uncollectible any notes or accounts receivable, except for write-offs in the ordinary course of business charged to applicable reserves, none of which individually or in the aggregate is material to the Company or the affected Subsidiary, (h) made any change in any accounting principle or auditing practice, (i) otherwise conducted its business or entered into any transaction, except in the usual and ordinary manner and in the ordinary course of business consistent with past practices, or (j) agreed, whether or not in writing, to do any of the foregoing. In addition, since such date, there has not been any material adverse change in the business, assets, liabilities, financial condition, or results of operations of the Company or any Subsidiary.

    3.12   Tax Matters.

        3.12.1  Definition of Taxes.  For purposes of this Agreement, references to "Taxes" include all federal, state, and local taxes, charges, and other assessments (including interest and penalties assessed in connection therewith) of whatever type including, without limitation, income, gross receipts, sales, transfer, value added, import, excise, use, real property, personal property, franchise, social security, payroll, and all other taxes, duties, and similar charges.

18

faresi.cbspurchaseagreemen 10.doc

**EXHIBIT A – PAGE 40**

3.12.2 <u>Tax Matters</u>. As of the date of this Agreement, all Tax returns, reports, and informational returns required to be filed by or on behalf of the Company or any Subsidiary have been properly and timely filed (including extensions) with the appropriate government agencies. On the date filed, all such Tax reports and returns were complete and accurate in all material respects and properly reflected, in all material respects, the Taxes of the Company and the Subsidiaries for the periods covered thereby. All Taxes accruable through the date of this Agreement have been paid or adequately reserved for. As of the date of this Agreement, no federal, state, or local Tax liens have been filed upon any property of the Company or any Subsidiary, there is no audit, examination, deficiency letter or proceeding, refund litigation, Tax claim, or notice of assessment or proposed assessment by any governmental authority in connection with the Company, and there has been no extension or waiver of any statute of limitations with respect to any open Tax year in which Taxes were due or paid by or on behalf of the Company or any Subsidiary.

3.13   <u>Real Property</u>. Neither the Company nor any Subsidiary owns or has ever owned any real property or interests therein, except for the leasehold interests listed in <u>Schedule 3.13</u>. <u>Schedule 3.13</u> contains a complete and accurate list of all real property presently leased by the Company and any Subsidiary as lessee, and each such lease is in full force and effect. All rents and additional rents due by the Company and any Subsidiary on each such lease have been paid, the Company and the Subsidiaries have been in peaceable possession since the commencement of the original term of such lease and have not received written notice of default thereunder, and no waiver, indulgence, or postponement of the Company's or any Subsidiary's obligations thereunder has been granted by the lessor. There exists no event of default or event, occurrence, condition, or act which, with the giving of notice, the lapse of time, or the happening of any

19

EXHIBIT A – PAGE 41

further event or condition, would cause a default under a lease to which the Company or any Subsidiary is a party, other than any event, occurrence or act that would not have a material adverse effect on the Company or any Subsidiary.

3.14    Personal Property.  Exhibit 3.14 contains a complete and accurate list of all material items of equipment, machinery, and other personal property that the Company or any Subsidiary owns or leases as of the date of this Agreement (together, **"Personal Property"**). Each lease to which an item of Personal Property is subject is listed on Schedule 3.14.  Neither the Company nor any Subsidiary is a lessor of any personal property.  As of the date of this Agreement, the Personal Property, taken as a whole, is in satisfactory operating condition, maintenance, and repair, given the purposes for which the Personal Property is used, except for maintenance and repairs required in the ordinary course of business.  As of the date of this Agreement, the Company and each Subsidiary is the owner of all Personal Property that it purports to own, free and clear of all Encumbrances, except for the security interests and other Encumbrances noted on Schedule 3.14.  Each lease to which an item of Personal Property is subject is, as of the date of this Agreement, in full force and effect and, there is no existing material default under any such lease and no event has occurred, which, with notice, lapse of time, or both, would constitute such a material default.

3.15    Material Contracts.  Schedule 3.15 contains a complete and accurate list of all **"Material Contracts"** (as defined below) to which the Company or any Subsidiary is a party as of the date of this Agreement.  The Company has made available to FAREISI complete and accurate copies of all Material Contracts and all amendments.  As of the date of this Agreement, each Material Contract is in full force and effect and, to the Company's knowledge, there is no existing material default under any such contract and no event has occurred, which, with notice,

20

**EXHIBIT A – PAGE 42**

any agreement with a federal, state, or local regulatory agency with respect to the business of the Company or any Subsidiary, (g) any agreement that contains any "change of control" provision, (h) any agreement, contract, or commitment limiting the right of the Company or any Subsidiary to engage in any line of business, to compete with any person or that otherwise imposes material restrictions on the business operations of the Company or any Subsidiary, (i) any contract or agreement with any provider of proprietary information used in the Company's products or services, (j) any contract or agreement with any of the ten (10) largest customers of the Company (on a consolidated basis) for each of its products and services as determined by sales by the Company (on a consolidated basis) during calendar year 1999, (k) any contract, agreement, or arrangement that requires the Company or any Subsidiary to pay a royalty, commission, or other fee based on sales of such person's products or services, (l) any agreement, contract, or commitment which might reasonably be expected to have a material adverse effect on the Company or any Subsidiary, (m) any contract, agreement, or understanding, whether written or oral, between or among the Company or any Subsidiary and any "**Covered Person**," as defined in Section 3.28 below.

    3.16   Employee Matters.

       3.16.1 Collective Bargaining Agents and Labor Relations.  Neither the Company nor any Subsidiary is or has ever been, a party to or bound by any collective bargaining contract with respect to any employees, is not presently negotiating any collective bargaining agreement with its employees, and, to the knowledge of the Company, Martorano, and Sefton, no campaign to establish any such arrangement is in process.  Neither the Company nor any Subsidiary has experienced any strike, slow-down, picketing, or work stoppage by a union or other group of employees at any time prior to the date of this Agreement.  There are no unfair labor practice

faresi.cbspurchaseagreemen 10.doc

charges, complaints, or proceedings pending against the Company or any Subsidiary before any court or government agency.

3.16.2  Compliance with Labor Laws.  Except as noted on Schedule 3.16.2, as of the date of this Agreement, no present or former employee or group of employees of the Company or any Subsidiary have threatened, asserted, or filed a claim against the Company or the affected Subsidiary, and all employee claims listed in Schedule 3.16.2 have been fully settled and neither the Company nor any Subsidiary has any further liability in connection therewith.

3.16.3  Employment Contracts.  Except for the employment agreements listed on Schedule 3.16.3, neither the Company nor any Subsidiary is subject to any employment contract, retention agreement, or severance contract with any of its employees, and neither the Company nor any Subsidiary has made any written representations or warranties to any employee regarding future employment rights. Schedule 3.16.3 lists the names of each employee of the Company or any Subsidiary whose compensation in 1999 (including bonuses) exceeded $100,000, together with the amount of such compensation.

3.16.4  Employee Benefit Plans.  Schedule 3.16.4 contains a complete and accurate list of all employee benefit and fringe benefit plans in which employees of the Company and any Subsidiary are eligible to participate as of the date of this Agreement by reason of such employment including, without limitation, profit-sharing plans, bonus plans, savings plans, deferred compensation plans, stock option plans, severance plans, hospitalization plans, insurance plans, vacation plans and other employee welfare benefit plans (together, "**Employee Benefit Plans**"). All Employee Benefit Plans maintained by the Company or any Subsidiary, or pursuant to which the Company or any Subsidiary has any obligation, are in compliance in all material respects with the requirements prescribed by any and all applicable statutes and

faresi.cbspurchaseagreemen 10.doc

EXHIBIT A – PAGE 44

regulations currently in effect, and the Company and the Subsidiaries have performed all material obligations required to be performed under, and are not in any material respect in default under or in violation of, any such Employee Benefit Plan.  Except as set forth in Schedule 3.16.4, as of the date of this Agreement, none of the Employee Benefit Plans provides for pension, retirement, or similar benefits to any employee of the Company or any Subsidiary or any beneficiary or dependent thereof after the employee's termination of employment, except to the extent required under applicable law.  None of the Employee Benefit Plans provides for continuing benefits or coverage for any employee or dependent or beneficiary thereof after the employee's termination of employment, except to the extent required by applicable law.  Except as set forth in Schedule 3.16.4, as of the date of this Agreement, there is no suit, action, dispute, claim, arbitration, or legal, administrative, or other proceeding or governmental investigation pending or, to the knowledge of the Company, Martorano, and Sefton, threatened, alleging any breach of the terms of any Employee Benefit Plan or of any statutory duties thereunder by the Company or any Subsidiaries, or violation of any applicable law by the Company or any Subsidiary, with respect to any Employee Benefit Plan.  For purposes of this Section 3.16.4, the term **"employee"** includes employees, directors, and officers of the Company or any Subsidiary.

3.17    Litigation.  Since inception, there have been no (a) actions, suits, proceedings, or investigations of any kind pending or, to the knowledge of the Company, Martorano, and Sefton, threatened, to which the Company or any Subsidiary is or was a party, or otherwise directly affecting the Company or any Subsidiary in any court, before any arbitrator, or before any governmental body or agency, or (b) judgments, writs, orders, or decrees to which the Company or any Subsidiary is or was subject.  There is no legal or administrative action pending or, to the

24                                faresi.cbspurchaseagreemen 10.doc

**EXHIBIT A – PAGE 45**

knowledge of the Company, Martorano, and Sefton, threatened, involving the Company or any Subsidiary.

3.18    Insurance.  Schedule 3.18 contains a complete and accurate summary of all insurance policies maintained by the Company or any Subsidiary as of the date of this Agreement showing the type and amount of the coverage.  All such insurance policies are in full force and effect and none will terminate, or will be subject to termination, solely by reason of the execution and performance of this Agreement.  There are no claims pending by the Company or any Subsidiary under any insurance policy, and, to the Company's knowledge, no circumstances have occurred that would permit the Company or any Subsidiary to make any claim under such policy that has not yet been made.  Neither the Company nor any Subsidiary has received any notice of a lapse of any insurance policy covering its operations.

3.19    Compliance with Laws.  Since inception, the Company and each Subsidiary has been, and it now is, in compliance with all federal, state, and local laws, regulations, and other requirements affecting its business and operations, the violation of which would be reasonably expected to have a material adverse affect on the business or financial condition of the Company or any Subsidiary.

3.20    Licenses, Permits, and Authorizations.  Schedule 3.20 contains a complete and accurate list of all material federal, state, and local licenses, permits, and authorizations held by the Company and each Subsidiary as of the date of this Agreement, and sets forth the expiration date of each such license, permit, and authorization.  None of such licenses, permits, or authorizations will terminate or be subject to termination by reason of the execution and performance of this Agreement.  As of the date of this Agreement, the Company and each Subsidiary holds all federal, state, and local licenses, permits, and authorizations necessary to

25

faresi.cbspurchaseagreemen 10.doc

**EXHIBIT A – PAGE 46**

permit it lawfully to conduct its businesses as presently conducted, in all material respects, except where the failure to so hold would not be reasonably expected to have a material adverse affect on the Company or the Subsidiary. As of the date of this Agreement, there are no actions pending or threatened by any federal, state, or local government commission, board, bureau, agency, or other governmental authority seeking to revoke, cancel, modify, or deny any such license, permit, or authorization or to deny any application made by the Company or any Subsidiary to obtain or renew such license, permit, or authorization. As of the date of this Agreement, the Company and each Subsidiary conducts its business so as to comply, in all material respects, with all licenses, permits, and authorizations material to its business.

3.21    Environmental Matters. To the knowledge of the Company, Martorano, and Sefton, as of the date of this Agreement, there are no Hazardous Substances (as defined below), or storage tanks containing Hazardous Substances, present on, in or under any real property leased, operated, or used by the Company or any Subsidiary, which presence would constitute a violation of, or require reporting under, any federal, state or local environmental law, ordinance, or regulation by the Company or any Subsidiary, or would support any demand, cause of action, claim, fine, or penalty by any person against the Company or any Subsidiary (including, without limitation, any claim for clean-up or remediation of any Hazardous Substances). For the purposes of this Agreement, **"Hazardous Substances"** means any and all pollutants, contaminants, and/or dangerous, toxic or hazardous chemicals, waste, minerals, or substances as defined in or governed by any applicable federal, state, or local law, ordinance, or regulation relating to the environment. Neither the Company nor any Subsidiary has conducted or authorized generation, transportation, storage, treatment, or disposal of any Hazardous Substances on any real property owned, leased, or operated by the Company or any Subsidiary.

26

EXHIBIT A – PAGE 47

There is no pending litigation or proceeding before any administrative agency, or communication, notice, or agreement from or with any governmental agency or private party, any of which relates in any material way to the presence, release, threat of release, placement, generation, transportation, storage, treatment, or disposal of any Hazardous Substances on any real property now or that has been leased, operated, or used by the Company or any Subsidiary and, to the knowledge of the Company, Martorano, and Sefton, none of the foregoing is threatened.

     3.22   Intellectual Property.

       3.22.1  General.  All Intellectual Property (as defined below) owned or used by the Company or any Subsidiary in its business is set forth on Schedule 3.22.1 (listed separately for each category).  For purposes of this Agreement, **"Intellectual Property"** means all intellectual property owned or used by the Company or any Subsidiary which is material to the conduct of its business including, without limitation, domestic and foreign patents and patent applications; registered and unregistered trademarks, trade names, service marks, copyrights, and assumed business names; computer software owned or licensed and all other rights with respect to computer software, hardware, documentation, and databases; know-how; and trade secrets and other proprietary information.  The Company or the applicable Subsidiary has sole title to, and the unrestricted right to use, license, and exploit all the Intellectual Property it purports to own.  None of the Intellectual Property the Company or a Subsidiary purports to own is subject to any lien, security interest, or other Encumbrance, except that the software that the Company or a Subsidiary licenses to or from third parties is subject to the terms of such licenses.

       3.22.2  Software and Hardware.  The Company and each Subsidiary has all third-party licenses and other rights required for it to use and operate the software and hardware used

27

faresi.cbspurchaseagreemen 10.doc

in its business, and its use and operation of such software and hardware do not violate the terms of any third-party license or other agreement, except where such violation could not be reasonably expected to have a material adverse effect on the Company or the affected Subsidiary. Neither the Company nor any Subsidiary license any software to any third party. All of the software owned, used, or licensed by the Company or any Subsidiary that is material to its business (together, "**Material Software**") has been (a) designed and developed such that it will be fully functional and perform in accordance with its specifications prior to, during, and after the calendar year 2000 A.D., or (b) is fully interoperable with year 2000-compliant software that will make all Material Software year 2000-compliant (including as to date data century recognition and calculations which will accommodate same century and multi-century formulas and date values). All Material Software will perform during each such period without any error relating to date functionality and/or data. All Material Software performs substantially in accordance with the documentation and other written materials used in connection with such software, is free of material defects in programming and operation, and is in machine readable form.

      3.22.3  <u>No Infringement</u>. Neither the Company nor any Subsidiary is subject to any restriction on its use of its Intellectual Property that would materially interfere with its ability to utilize such Intellectual Property as presently used. The use of the Intellectual Property by the Company and the Subsidiaries does not conflict with, violate, infringe upon, or constitute a misappropriation of any Intellectual Property of another person, except when such conflict, violation, infringement, or interference would not be reasonably expected to result in a material adverse effect on the Company or the affected Subsidiary. Neither the Company nor any Subsidiary has received any written notice that its use of any Intellectual Property conflicts with,

faresi.cbspurchaseagreemen 10.doc

infringes upon, violates or interferes with the intellectual property rights of any other person. To the knowledge of the Company, Martorano, and Sefton, neither the Company nor any Subsidiary, is in default under the terms of any third-party license or other right to use the Intellectual Property, which default may have a material adverse effect on the Company or any Subsidiary.

3.22.4  No Patents.  Neither the Company nor any Subsidiary or any Covered Person or Affiliate (as defined in Section 3.28) of such person owns any patent, or has any right or interest in any patent or patentable invention, that relates to the business of the Company or any Subsidiary.

3.22.5  Confidentiality Agreements.  Each employee, officer, director, and agent of the Company or any Subsidiary who has executed and delivered a confidentiality agreement to the Company or a Subsidiary is listed on Schedule 3.22.5.  To the knowledge of the Company, Martorano, and Sefton, no such person is in violation of any such agreement.

3.23  Open Orders.  All the open orders of the Company or any Subsidiary for services and products in excess of $5,000 as of July 21, 2000, or thereafter, are listed in Schedule 3.23. All such open orders as of such date were entered into in the ordinary course consistent with past practice.

3.24  Accounts Receivable.  All of the accounts receivable of the Company each Subsidiary together with an aging schedule as of July 21, 2000, or thereafter, are as set forth on Schedule 3.24.  All such accounts receivable will be collected in full, less the amount of allowance for doubtful accounts and discounts reflected in such exhibit, and such net receivables will not be subject to any adjustment in the nature of a counterclaim, setoff, or otherwise, except for adjustments pursuant to normal occurrences and allowances.

29

faresi.cbspurchaseagreemen 10.doc

3.25   <u>Quality of Products and Services</u>.  Neither the Company nor any Subsidiary has had (and does not now have) any material claims against it in connection with its products or services.

3.26   <u>Indebtedness</u>.  <u>Schedule 3.26</u> sets forth all of the indebtedness of the Company and each Subsidiary for borrowed funds, trade payables, and other indebtedness as of the date of this Agreement (except that the trade payables are as of July 21, 2000, or thereafter), including the name of the person to whom the Company or the Subsidiary indebted, the initial amount of indebtedness and the current amount outstanding, the rate of interest, and if such indebtedness is secured or guaranteed, a description of the collateral and the name of the guarantor.  Neither the Company nor any Subsidiary is in default under the terms of any agreement of which it is party concerning such indebtedness (including loan agreements, security agreements, and other agreements), and no event has occurred, which, with the passage of time, notice, or both, would create a default under any such agreement.

3.27   <u>Royalties and Commissions</u>.  <u>Schedule 3.27</u> contains a list of each person to whom the Company or any Subsidiary is obligated to pay any royalty, commission, or other fee in connection with sales or licenses of its products and services, together with a brief description of the basis on which such royalty, commission, or fee is paid when the Company's or Subsidiary's obligation to make such payments terminates, and the amount of such payments paid in calendar year 1999.

3.28   <u>Related Party Transactions</u>.

3.28.1   <u>General</u>.  Except as described on <u>Schedule 3.28</u>, neither Martorano, Sefton, nor any other past or present employee, officer, or director of the Company, any Subsidiary, or any Affiliate (as defined below) of any such person (each a **"Covered Person"**),

faresi.cbspurchaseagreemen 10.doc

possesses, directly or indirectly, any interest in any item of personal or real property leased or used by the Company or any Subsidiary, except in their capacity as shareholders of the Company.  Except as described on Schedule 3.28, neither the Company nor any Subsidiary has made any loan or advance to, or guaranteed the indebtedness of, any Covered Person.  Except as set forth on Schedule 3.28 and with respect to Covered Persons who are employees of the Company or a Subsidiary in connection with amounts due under normal compensation arrangements or reimbursable as ordinary business expenses, neither the Company nor any Subsidiary is indebted to any such person.  Except as set forth on Schedule 3.28, no Covered Person possesses, directly or indirectly, any financial interest in, or is a director, officer, or employee of, or consultant to, any business which is a supplier, customer, lessor, competitor, or potential competitor of the Company or any Subsidiary.  No Covered Person or any other person has any right to be indemnified by the Company or any Subsidiary whether pursuant to contract or otherwise (except as required by statute).  The consummation of the transactions contemplated in this Agreement will not, either alone or upon the occurrence of any act or event, lapse of time, or both, result in any severance or other payment becoming due from the Company or any Subsidiary to any Covered Person or Affiliate thereof.  For purposes of this Agreement, an "**Affiliate**" of a person that is not an individual is an entity controlled by such person, that controls such person, or is under common control with such person, and an "**Affiliate**" of a person that is an individual is any spouse, in-law, sibling, child, or grandchild of such person.

3.28.2  Software License.  The software used by the Company that is licensed to the Company by American Benefit Company is noted on Schedule 3.28 ("**Affiliate Software**"). Martorano and Sefton represent and warrant that they are the sole owners of American Benefit Company, and that American Benefit Company has the sole and unrestricted right, title, and

31

interest in and to the Affiliate Software, and that except for the Company, no other person has been granted any license or other right to use the Affiliate Software.

3.29    _Completeness of Documents_.  All documents delivered or made available to FAREISI by the Company, Martorano, Sefton or their agents, attorneys, accountants, advisers, or other representatives (together "**Representatives**") of the Company or the Subsidiaries in connection with FAREISI's due diligence review of the Company are accurate and complete originals or copies thereof and include all material amendments, exhibits, and schedules.

3.30    _Books and Records_.  The books and records of the Company and each Subsidiary accurately reflect, in all material respects, all material transactions to which it is, or was, a party or by which its property or assets are, or were, subject or bound.  Without limiting the generality of the foregoing, the minute books and other records of the Company and each Subsidiary contain complete and accurate records in all material respects of all corporate actions of its shareholders and board of directors and reflect all material transactions involving the Company and each Subsidiary, and the Company's and each Subsidiary's stock transfer records are complete and correct in all material respects.  Neither the Company nor any Subsidiary has any records, systems, controls, data, or other information recorded, stored, maintained, operated, or otherwise wholly or partly dependent upon or held by any means (including any electronic, mechanical, or photographic process, whether computerized or not), which (including all means of access thereto and therefrom) are not under its exclusive ownership and direct control.

3.31    _No Brokers_.  Neither Martorano, Sefton, nor the Company or any Subsidiary has retained any investment banker, broker, or finder in connection with any transaction related to this Agreement, and no such person has any liability for fees or commissions to any person in connection with any such transaction.

faresi.cbspurchaseagreemen 10.doc

EXHIBIT A – PAGE 53

3.32   Disclosure. No representation or warranty by the Company, Martorano, or Sefton contained in this Article 3 contains any untrue statement of a material fact, or omits to state any material fact required to make the statements herein or therein contained not misleading, or necessary in order to provide a prospective purchaser shares of Common Stock as contemplated hereunder with complete information as to such securities and the business and condition of the Company (financial and otherwise). The representations and warranties of the Company, Martorano, and Sefton contained in this Article 3 shall not be affected or deemed waived by reason of any investigation made by FAREISI or its Representatives or the fact that FAREISI or its Representatives knew or should have known that any such representation or warranty was, or might be, inaccurate in any respect.

# ARTICLE 4

# REPRESENTATIONS AND WARRANTIES OF FAREISI

FAREISI represents and warrants to Martorano and Sefton as of the Initial FAREISI Shares Closing Date, and to the CBS Shareholders as of the date of each exercise of FAREISI Option as follows:

4.1   Organization. FAREISI is a corporation that is duly incorporated and organized, validly existing, and in good standing under the laws of the state of California.

4.2   Authorization. FAREISI has all requisite corporate power and authority, to execute, deliver, and perform its obligations under this Agreement, and the transactions herein and therein have been duly authorized and approved by FAREISI in accordance with all applicable state laws and its articles of incorporation and bylaws. No other corporate action on the part of FAREISI is required for FAREISI to execute, deliver, and perform this Agreement.

33

faresi.cbspurchaseagreemen 10.doc

4.3   <u>Execution and Delivery; Enforceability</u>.  This Agreement has been duly executed and delivered by FAREISI and constitutes the valid and binding agreement of FAREISI and is enforceable against FAREISI in accordance with its terms, subject to the effect of Creditor Rights Laws and Equitable Principles.

4.4   <u>No Contravention</u>.  The execution, delivery, and performance by FAREISI of this Agreement does not conflict with, contravene, violate, or constitute an event of default under, or result in a breach of, or require any notice to be given under, any provision of the articles of incorporation or bylaws of FAREISI, or any agreement, contract, judgment, injunction, order, decree, or other instrument to which FAREISI is a party or by which it is bound.

4.5   <u>No Consents or Regulatory Approvals</u>.  Subject to the Hart-Scott-Rodino Act and the requirements of the Securities Act and state securities laws, to the extent applicable, no consent of, approval by, filing with, or notice to, any governmental authority or any other person or entity is required for FAREISI to execute, deliver, and perform this Agreement.

4.6   <u>No Brokers</u>. Except for Marketshare of Virginia, Inc. ("**MVI**"), FAREISI has not retained any investment banker, broker, or finder in connection with any transaction related to this Agreement, and has not incurred any liability to any such person in connection with any such transaction. FAREISI will be solely responsible for all amounts owed by FAREISI to MVI in connection with this Agreement.

4.7   <u>Purchase for Own Account</u>.  FAREISI is a sophisticated investor with experience in investing in securities such as the Common Stock, and all shares of Common Stock acquired by FAREISI hereunder will be acquired for investment purposes only, and not with a view to the resale or distribution of any part thereof.  FAREISI agrees that, except pursuant to <u>Section 2.7</u>, it will not sell, encumber, or otherwise transfer any Initial FAREISI Shares or other shares of

34

**EXHIBIT A – PAGE 55**

Common Stock it acquires pursuant to the exercise of FAREISI Options until it acquires all the issued and outstanding shares of Common Stock, at which time such restriction shall not apply.

## ARTICLE 5

## COVENANTS

5.1    <u>Hart-Scott-Rodino Act</u>. In the event that FAREISI reasonably concludes that a notification or report is required to be filed under the Hart-Scott-Rodino Act in connection with FAREISI's exercise of FAREISI Options after the date hereof, or that the failure to file any such notification or report would subject FAREISI or any other party to civil penalties or delay the expiration of any waiting period prior to the exercise of any right granted to FAREISI under this Agreement, the applicable parties shall promptly effect any such notifications and pay all filing fees relating to such notifications that such parties are required to pay under applicable law.

5.2    <u>FAREISI Directorship</u>. So long as FAREISI owns any shares of Common Stock, FAREISI shall have the right to designate one person to be appointed as a director of CBS and each Subsidiary ("**FAREISI Designee**"), provided that the FAREISI Designee for each entity may be the same or different persons.  The Company agrees to vote all its shares of each Subsidiary's capital stock, and each CBS Shareholder covenants that he will vote all his shares of Common Stock, to appoint the FAREISI Designee to such offices.  FAREISI may replace any FAREISI Designee at any time upon written notice to the CBS Shareholders, and the CBS Shareholders covenant that they will vote their shares of Common Stock to effect such replacement.

5.3    <u>Negative Covenants of Company</u>.  During the "**Restricted Period**" (as defined below), the Company shall not take, and shall cause each Subsidiary not to take, any "**Restricted Activity**"(as defined below).  For purposes of this Agreement, the "**Restricted Period**" is the

faresi.cbspurchaseagreemen 10.doc

period commencing on the Initial FAREISI Shares Closing Date and ending on the later of (a) the date that the FAREISI Options have expired, and (b) if FAREISI has exercised FAREISI Options for all the shares of Common Stock it does not then own and the parties have agreed upon the price terms of the transaction pursuant to Section 2.5, but its acquisition is not completed by such expiration date, the date such acquisition is completed.  For purposes of this Agreement, "**Restricted Activities**" consist of the following activities:

a.     Issuance of any new shares of Common Stock or other equity securities or securities exchangeable for or otherwise convertible into, or any right to acquire any such securities, except for the issuance of shares of Common Stock described in Section 2.2 in connection with the HUB Acquisition.

b.     Redemption of shares of capital stock or effecting any stock split, stock dividend, or other recapitalization transaction.

c.     Except for the HUB Acquisition and the limited liability company that FAREISI and the Company have organized, engaging in any merger, consolidation, share exchange or other business combination transaction, acquiring any subsidiary, or making any material equity investment in any person.

d.     Selling, leasing, or otherwise transferring or disposing of all or any significant portion of its assets except in the ordinary course of business.

e.     Entering into any new unrelated line of business.

f.     Entering into any retention, severance, or similar contract with any employee unless approved by its board of directors.

36

faresi.cbspurchaseagreemen 10.doc

**EXHIBIT A – PAGE 57**

g.    Entering into any new employment agreement with an executive (or making any material modification to any such existing employment agreement) unless approved by its board of directors.

h.    Establishing any new pension, retirement, key man insurance, or other Employee Benefit Plan or modifying any existing Employee Benefit Plan to materially increase the sponsor's obligations thereunder, except as required under applicable law.

i.    Entering into any transaction with any Covered Person or Affiliate thereof, except consistent with historical practices and on arms'-length terms.

j.    Entering into any Restrictive Agreement.

k.    Conducting its business and operations outside the ordinary course of business consistent with prior business practices.

l.    Changing any of its accounting practices or principles, except (x) as required by law or to conform to GAAP, and (y) in connection with the determination of Adjusted ATNI as provided in this Agreement.

m.    Entering into discussions with any person with respect to, or otherwise attempt to, engage, directly or indirectly, in any of the foregoing transactions.

5.4    Exclusive Dealing. During the Restricted Period, except in connection with the HUB Acquisition, the Company and each CBS Shareholder covenants and agrees not to, directly or indirectly through any third party or otherwise, solicit or entertain offers from, or negotiate with, or in any manner discuss, encourage, or accept any proposal from any person (other than FAREISI as contemplated hereunder) relating to the acquisition of the Company or any Subsidiary or any of their shares of capital stock (whether newly issued or owned by the Company or any CBS Shareholder), or any of the  assets, properties, other securities, or business

faresi.cbspurchaseagreemen 10.doc

of the Company or any Subsidiary, in whole or in part, whether through direct purchase, merger, consolidation, share exchange, other business combination, or any other transaction. In addition, during the Restricted Period, each CBS Shareholder covenants and agrees that he will not directly or indirectly sell, assign, gift, dispose, pledge, or otherwise transfer any shares of Common Stock or interest therein (except to FAREISI pursuant to this Agreement), or create, or suffer the creation of, any Encumbrance on any such shares, in each case, whether voluntarily, involuntarily, by operation of law, or otherwise, or attempt to do any of the same. Notwithstanding the foregoing, Martorano or Sefton may sell shares of Common Stock to each other pursuant to the Stockholders' Agreement; provided, however that such shares shall remain subject to the FAREISI Options.

5.5   Due Diligence. Upon FAREISI's exercise of a FAREISI Option, during the Exercise Period for such option and, if there is a Pricing Period, during such period, FAREISI and its Representatives shall have full access to the properties, facilities, books and records, work papers, documents, employees, customers, accountants, attorneys, and other items and persons relating to the Company and each Subsidiary during normal business hours, upon reasonable prior notice, to enable FAREISI and its Representatives to conduct an on-going, thorough due diligence of the business, operations, financial condition, and prospects of such entities; provided, however, such right shall terminate with respect to such exercise upon FAREISI's receipt of notice that the Avoidance Right has been exercised with respect to such exercise. In order to enable FAREISI to conduct such due diligence, the CBS Shareholders and the Company covenant that they will provide FAREISI and its Representatives with all due diligence materials and access reasonably requested by FAREISI and its Representatives promptly after such request.

faresi.cbspurchaseagreemen 10.doc

5.6   <u>Affirmative Covenants of Company</u>.  During the Restricted Period, the Company shall (a) provide FAREISI with copies of its quarterly consolidated financial statements within fifteen (15) days after the end of each calendar quarter and, if requested by FAREISI, separate financial statements for the Company and each Subsidiary, (b) promptly notify FAREISI of any Material Contract entered into by the Company or any Subsidiary, and (c) promptly notify FAREISI of any adverse material change in the business, financial condition, or prospects of the Company or any Subsidiary or any event which is reasonably likely to result in such adverse change of which the Company is aware.  In addition, The Company covenants to FAREISI that it will cause the CBS Financial Statements for calendar years 2000, 2001, and 2002 to be prepared and delivered to FAREISI not later than February 15 of the next succeeding calendar year.

5.7   <u>Assignment of Affiliate Software</u>.  Martorano and Sefton covenant that until the expiration of the Restricted Period, they will cause American Benefit Company not to assign, license, convey, pledge, transfer, dispose, or otherwise grant any right or interest in any of the Affiliate Software, and that the Company will be the sole person that is authorized to use such software.  In addition, Martorano and Sefton covenant that not later than the date of the closing of the transaction pursuant to which FAREISI acquires control of the Company pursuant to its exercises of FAREISI Options, they will cause American Benefit Company to transfer all its right, title, and interest in the Affiliate Software (including, without limitation, all source code, object code, manuals, know-how, design materials, prototypes, flow-charts and diagrams, and other documentation) to the Company without payment of any consideration. At the time of such transfer, American Benefit Company will deliver all copies of the Affiliate Software to the Company together with instruments of transfer in form and substance reasonably satisfactory to the Company.

faresi.cbspurchaseagreemen 10.doc

## ARTICLE 6

## CONDITIONS OF PURCHASES OF SHARES

6.1    <u>Conditions Precedent to Obligations of FAREISI, Company, and CBS Shareholders</u>.  The respective obligations of FAREISI, Martorano, Sefton, and the Company to effect the Initial FAREISI Shares Closing, and the respective obligations of FAREISI and the CBS Shareholders to effect the purchase and sale of the shares of Common Stock pursuant to exercises of FAREISI Options, as the case may be (each a **"Share Purchase Transaction"**), are subject to the satisfaction or written waiver, at or prior to the applicable closing date for such Share Purchase Transaction, of each of the following conditions:

6.1.1    <u>Regulatory Approvals</u>.  Each party to such transaction shall have received all regulatory consents, approvals, authorizations, and orders required for it to consummate the transaction, if any and start of any waiting periods shall have expired or been terminated; and each party to such transaction shall have delivered to the other parties copies of all such approvals, orders, notices, and other documents it has received, if any.

6.1.2    <u>No Injunctions</u>.  No injunction or other order of any nature entered by any court of competent jurisdiction shall be issued and remain in effect that would prevent, in any material respect, the consummation of such transaction or any other transaction contemplated in this Agreement.

6.1.3    <u>Other Documents</u>.  Each party to such transaction shall have delivered to the other party such other certificates, documents, and instruments as the other party may reasonably request related to such transaction.

6.2    <u>Conditions Precedent to Obligations of FAREISI</u>.  The obligation of FAREISI to complete the purchase of any Share Purchase Transaction is subject to satisfaction or written

faresi.cbspurchaseagreemen 10.doc

Consents, (a) each person whose prior approval would be required for FAREISI to acquire control of the Company pursuant to this Agreement shall have provided FAREISI with such consent in writing (without imposition of any materially burdensome or adverse condition or requirement), and (b) each person to whom the Company or any Subsidiary owes money, or in favor of whom any of the Company's or any Subsidiary's assets or properties is subject to any material Encumbrance, shall have provided a certificate or other statement in writing (i) to the effect that, to its knowledge, the Company or affected Subsidiary is not in default of any obligation in connection with such indebtedness or Encumbrance and, to its knowledge, no event has occurred, which, with the passage of time, notice, or both would result in such default, and (ii) waiving all defaults by the Company or the affected Subsidiary, of which it has knowledge, prior to the Initial FAREISI Shares Closing Date (including defaults by reason of events occurring on or prior to such date, which, with the passage of time, notice, or both would result in such default).

      6.2.3.2   <u>Legends</u>.  All the certificates representing all the shares of Common Stock owned by Martorano and Sefton shall have been legended by the Company as described in <u>Section 2.11</u> and the Company shall have delivered evidence thereof to FAREISI.

    6.3   <u>Conditions Precedent to Obligations of Company and CBS Shareholders</u>.  The obligation of the Company and the CBS Shareholders consummate the applicable Share Purchase Transaction is subject to the satisfaction or written waiver by such person, at or prior to the closing date of such transaction, of the following conditions: Each of the representations and warranties of FAREISI set forth in <u>Article 4</u> shall be true and correct as of such closing date, and FAREISI shall have performed and complied with all agreements, obligations, and conditions contained in this Agreement that are required to be performed and complied with by FAREISI on

42

faresi.cbspurchaseagreemen 10.doc

**EXHIBIT A – PAGE 62**

or before such date, including payment of the applicable purchase price for the shares of Common Stock purchased by FAREISI in such transaction.

     6.3.1   <u>FAC Shares</u>. In the event that FAC Shares are included in the Exercise Price with respect to an exercise of the CBS Shareholder Options, the obligation of the CBS Shareholders to close such transaction is subject to the satisfaction or written waiver by such persons, at or prior to the closing date of such transaction, of the following additional conditions:

     (a)    The FAC Shares to be delivered to the CBS Shareholders in such transaction (i) shall have been duly authorized and, when delivered, shall be validly issued, fully paid and nonassessable; (ii) shall be registered pursuant to an effective registration statement under the Securities Act and no stop order shall have been issued by the SEC with respect to such registration statement; (iii) and shall be issued in compliance with federal securities laws and the applicable state securities laws.

     (b)    Upon delivery, such shares will be freely tradable under federal and state securities laws by the CBS Shareholders who receive them in such transaction.

     (c)    FAC shall have prepared and submitted to the New York Stock Exchange a listing application covering the FAC Shares to be issued to the CBS Shareholders in such transaction, and the New York Stock Exchange shall have approved such shares for listing and trading on the New York Stock Exchange, subject to the official notice of issuance.

faresi.cbspurchaseagreemen 10.doc

# ARTICLE 7

## CLAIMS AND RELATED MATTERS

7.1   <u>Survival</u>.  With respect to the purchase and sale of the Initial FAREISI Shares, the representations and warranties of the parties shall survive for three (3) years after the Initial FAREISI Shares Closing Date, except (a) the representations and warranties contained in Sections 2.10.5 and 3.6.4 shall not terminate, (b) the representations and warranties contained in Section 3.12, shall terminate upon the expiration of the applicable statute of limitations (including any extension granted) with respect to the applicable Tax liabilities, and (c) all representations and warranties of the Company shall terminate on the date that FAREISI acquires in excess of fifty (50) percent of the issued and outstanding shares of Common Stock. With respect to (a)  purchase and sale of shares of Common Stock pursuant to the exercise of a FAREISI Option, the representations and warranties of the CBS Shareholders in Section 2.10, and FAREISI's representations and warranties in connection with such exercise, shall survive for one (1) year after each closing of such transaction, except that the representations and warranties given in Section 2.10.5 shall not terminate.  All covenants of the parties contained in this Agreement shall survive until fully performed.

7.2   <u>Damages</u>.  Any Damage (as defined below) with respect to a breach of a representation, warranty, covenant, or other agreement of a party contained in this Agreement shall be made by the claiming party by written demand upon the indemnifying party prior to the expiration of the applicable survival period (if any).  For purposes of this Agreement, **"Damage"** means any and all losses, costs, expenses (including reasonable attorney fees at trial and on appeal), demands, actions, and claims.

faresi.cbspurchaseagreemen 10.doc

7.3     Indemnification by CBS Shareholders.  Each CBS Shareholder indemnifies, defends, and holds harmless FAREISI from and against any and all Damages incurred by FAREISI based upon, arising out of, or otherwise in respect of any material inaccuracy in, or breach of, any representation, warranty, covenant, or other agreement of such person contained in this Agreement.

7.4     Indemnification by the Company.  The Company indemnifies, defends, and holds harmless FAREISI from and against any and all Damages incurred by FAREISI based upon, arising out of, or otherwise in respect of any material inaccuracy in, or breach of, any representation, warranty, covenant, or other agreement of the Company contained in this Agreement.

7.5     Indemnification by FAREISI.  FAREISI indemnifies, defends, and holds harmless the Company, and to the extent affected, the CBS Shareholders, from and against any and all Damages incurred by such persons based upon, arising out of, or otherwise in respect of any inaccuracy in, or any breach of, any representation, warranty, covenant, or other agreement of FAREISI contained in this Agreement.

## ARTICLE 8

## OTHER MATTERS

8.1     Notices, Etc.  Notices and other communications given by one party to another party in connection with this Agreement shall be sent to the receiving party by facsimile at such party's facsimile number set forth below, and shall be confirmed by depositing a hard copy of the notice or other communication in the United States first class mail, as the case may be, addressed to the receiving party at the address set forth below.  Such hard copies shall be deposited in the U.S. first class mail, postage prepaid, not later than two (2) business days after

45                        faresi.cbspurchaseagreemen 10.doc

**EXHIBIT A – PAGE 65**

the day the facsimile was sent. A party may change the facsimile number or address for notice set forth below, by providing written notice thereof to the other party in accordance with the provisions of this Section 8. Such change shall be effective upon the receiving party's actual receipt of notice of the change.

| If to the Company | Facsimile: | (630) 420-2294 |
| | Attention: | Michael Martorano, President |
| | Address: | 1620 Bond Street |
| | | Naperville, Illinois 60563 |
| If to FAREISI: | Facsimile: | (619) 938-7020 |
| | Attention: | Donald A. Robert, Executive Vice President |
| | Address: | 12395 First American Way |
| | | Poway, California 92064 |
| If to a CBS Shareholder | Address: | 1620 Bond Street |
| | | Naperville, Illinois 60563 |
| | Facsimile: | (630) 420-2294 |

8.2    <u>Amendments and Waiver</u>. This Agreement may be amended or modified by, and only by, a written instrument executed by all of the parties affected by such amendment or modification. The terms of this Agreement may be waived by, and only by, a written instrument executed by the party against whom such waiver is sought to be enforced.

8.3    <u>Expenses</u>. Each party to this Agreement shall pay its own expenses (including, without limitation, the fees and expenses of such party's counsel incidental to the preparation of and consummation of this Agreement.

faresi.cbspurchaseagreemen 10.doc

8.4   Headings.  The headings contained in this Agreement are for convenience of reference only and shall not in any way affect the meaning or interpretation of this Agreement.

8.5   Pronouns; Number.  As the context may require in this Agreement, the use of any gender (male, female, or neuter) shall include any other gender, and the singular shall include the plural.

8.6   Interpretation.  Any reference made in this Agreement to a "**section**," "**exhibit**", or "**schedule**", shall be to a section of, or an exhibit, or schedule to, this Agreement unless otherwise indicated.  Unless the context requires otherwise, references in this Agreement to a "**party**", mean a party to this Agreement.  Whenever the words "**include**", "**includes**", and "**including**" are used in this Agreement, they shall be deemed to be followed by the words "without limitation."   As used in this Agreement, the term "**person**" refers to individuals, entities, governmental agencies, partnerships, joint ventures, joint stock companies, corporations, trusts, limited liability companies, unincorporated organizations, other groups and associations, and federal, state, or local governmental units, authorities, bodies, departments, agencies, and political subdivisions.

8.7   Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute one and the same instrument.

8.8   Parties in Interest; Assignment.  This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors and permitted assigns.  This Agreement shall not be assigned by any party without the written consent of the other parties, except that FAREISI may assign some or all its options and other rights under this Agreement to any person that, directly or through one or more intermediaries, controls FAREISI, FAREISI

faresi.cbspurchaseagreemen 10.doc

controls, or is under common control with FAREISI or any person that is the successor in interest to any such person (whether by merger, consolidation, asset sale, spin-off, or otherwise), provided that FAREISI has given the other affected parties prior written notice of such assignment and the assignee has sufficient financial resources to discharge all its obligations in connection with the rights assigned.

8.9    Recitals, Schedules, and Exhibits.  All recitals at the beginning of this Agreement, and all schedules and exhibits referred to in this Agreement, are incorporated herein for all purposes.

8.10    Equitable Remedies.  Due to the fact that FAREISI will be irreparably damaged in the event that this Agreement is not specifically enforced, in the event of a breach or threatened breach of the terms of this Agreement by any of the other parties hereto, FAREISI shall, in addition to all other remedies, be entitled to a temporary or permanent injunction, specific performance, and other equitable relief, without showing any actual damage or posting bond, in addition to any other remedies of law or in equity (including monetary damages) to which FAREISI may be entitled.

8.11    Entire Agreement.  This Agreement, together with all exhibits and schedules hereto, constitutes the entire agreement and understanding among the parties hereto relating to the subject matter hereof and supersedes any prior or contemporaneous agreements and understandings relating to such subject matter, whether written or oral.

8.12    Legal Invalidity.  If any part or provision of this Agreement is or shall be deemed violative of any applicable law or public policy, such legal invalidity shall not void this Agreement or affect the remaining terms and provisions of this Agreement, and this Agreement

faresi.cbspurchaseagreemen 10.doc

shall be construed and interpreted to comport with all applicable laws and public policies to the maximum extent possible.

8.13    Attorney Fees.  In the event a party shall seek enforcement of a provision of this Agreement, the party that prevails in such enforcement proceeding shall be entitled to recover such reasonable costs and attorney fees as shall be determined by the court at trial and upon any appeal therefrom and in connection with enforcing any judgment rendered therein.  For purposes of the foregoing, the prevailing party shall be the party that succeeds either affirmatively or defensively on the claims having the greater value or importance, as decided by the court.

8.14    Governing Law.  The validity, interpretation, and enforcement of this Agreement shall be governed by the laws of the State of Illinois (without reference to the principles of conflict of laws thereof).

8.15    Form of Public Disclosures.  No party shall make any public disclosures regarding this Agreement and the transactions contemplated herein unless FAREISI and the Company have approved in advance the form and substance thereof.  Neither FAREISI nor the Company shall unreasonably withhold such approval.  This Section 8.15 shall not preclude a party from giving any notices required in connection with the transactions, or from making any disclosure, it is required to give or make under applicable law.

8.16    Cumulative Rights and Remedies.  All of the rights and remedies provided to the parties under this Agreement are cumulative, and none is exclusive of any other right or remedy a party may have hereunder or under applicable law.

8.17    No Third-Party Beneficiaries.  Each party hereto intends that this Agreement shall not benefit or create any right or cause of action in or on behalf of any person other than the parties hereto and their respective successors and permitted assigns.

faresi.cbspurchaseagreemen 10.doc

IN WITNESS WHEREOF, each party has hereto executed the Agreement, or caused this

Agreement to be executed by its respective duly authorized officer, as of the date set forth above.

**FIRST AMERICAN REAL ESTATE INFORMATION SERVICES, INC.**

By _~~Amar h. Roint~~_

Title: _____

Date: July 31, 2000

**CBS SHAREHOLDERS:**

_____

Michael Martorano
Date: July 31, 2000

_____

William Sefton
Date: July 31, 2000

**CONSUMER BENEFIT SERVICES, INC.**

By _____

Title: _____

Date: July 31, 2000

**HUB SHAREHOLDER:**

**(To be executed at closing of HUB Acquisition)**

_____

Richard Jennison

Date: _____

**CONSENT OF SPOUSES**

The undersigned is the spouse of Michael Martorano a shareholder of the Company ("Shareholder"). The undersigned consents to the Shareholder entering into this Agreement, and agrees that any interest she has in the shares of Common Stock owned by the Shareholder, whether such interest is now owned or hereafter acquired, and whether such interest is created voluntarily or by operation of law, will be bound by all the provisions of this Agreement.

Dated: July 31, 2000

_____

Janet Martorano

faresi.cbspurchaseagreemen 10.doc

EXHIBIT A ~ PAGE 70

The undersigned is the spouse of William Sefton a shareholder of the Company ("Shareholder"). The undersigned consents to the Shareholder entering into this Agreement, and agrees that any interest she has in the shares of Common Stock owned by the Shareholder, whether such interest is now owned or hereafter acquired, and whether such interest is created voluntarily or by operation of law, will be bound by all the provisions of this Agreement.

Dated: July 31, 2000                       _____
                                                         Rebecca Sefton

### (To be signed at closing of HUB Acquisition)

The undersigned is the spouse of Richard Jennison a shareholder of the Company ("Shareholder"). The undersigned consents to the Shareholder entering into this Agreement, and agrees that any interest she has in the shares of Common Stock owned by the Shareholder, whether such interest is now owned or hereafter acquired, and whether such interest is created voluntarily or by operation of law, will be bound by all the provisions of this Agreement.

Dated: _____            _____

                                                Name: _____

51                                    faresi.cbspurchaseagreemen 10.doc

IN WITNESS WHEREOF, each party has hereto executed the Agreement, or caused this Agreement to be executed by its respective duly authorized officer, as of the date set forth above.

**FIRST AMERICAN REAL ESTATE INFORMATION SERVICES, INC.**

By _____

Title: _____

Date: July 31, 2000

**CONSUMER BENEFIT SERVICES, INC.**

By _____

Title: _PResideNT_

Date: July 31, 2000

**CBS SHAREHOLDERS:**

Michael Martorano
Date: July 31, 2000

William Sefton
Date: July 31, 2000

**HUB SHAREHOLDER:**

**(To be executed at closing of HUB Acquisition)**

_____
Richard Jennison

Date: _____

## CONSENT OF SPOUSES

The undersigned is the spouse of Michael Martorano a shareholder of the Company ("Shareholder"). The undersigned consents to the Shareholder entering into this Agreement, and agrees that any interest she has in the shares of Common Stock owned by the Shareholder, whether such interest is now owned or hereafter acquired, and whether such interest is created voluntarily or by operation of law, will be bound by all the provisions of this Agreement.

Dated: July 31, 2000

_____
Janet Martorano

faresi.cbspurchaseagreemen 10.doc

**EXHIBIT A – PAGE 72**

EXHIBIT A

$1,000,000                                                    July 31, 2000

## PROMISSORY NOTE

FOR VALUE, the current receipt and reasonable equivalence of which are hereby acknowledged, **First American Real Estate Information Services, Inc.**, a California corporation ("Maker"), promises and agrees to pay to the order Consumer Benefit Services Inc., an Illinois corporation ("Holder"), at 1620 Bond Street, Naperville, Illinois 60563 (or such other address as Holder shall specify to Maker in writing), the principal amount of $1,000,000 in lawful money of the United States of America and, prior to an Event of Default or the Maturity Date (as defined below), accrued interest on the unpaid principal balance, from the date of this note, at the rate of 10 percent per annum. Maker will pay the principal amount of this note and accrued interest in the following installments:

| Payment Date | Principal Amount | Interest Amount | Total Payment |
|---|---|---|---|
| November 1, 2000 | $83,333.33 | $25,000.00 | $108,333.33 |
| February 1, 2001 | $83,333.33 | $22,916.67 | $106,250.00 |
| May 1, 2001 | $83,333.33 | $20,833.33 | $104,166.66 |
| August 1, 2001 | $83,333.33 | $18,750.00 | $102,083.33 |
| November 1, 2001 | $83,333.33 | $16,666.67 | $100,000.00 |
| February 1, 2002 | $83,333.33 | $14,583.33 | $97,916.66 |
| May 1, 2002 | $83,333.33 | $12,500.00 | $95,833.33 |
| August 1, 2002 | $83,333.33 | $10,416.67 | $93,750.00 |
| November 1, 2002 | $83,333.33 | $8,333.33 | $91,666.66 |
| February 1, 2003 | $83,333.33 | $6,250.00 | $89,583.33 |
| May 1, 2003 | $83,333.33 | $4,166.67 | $87,500.00 |
| August 1, 2003 | $83,333.37 | $2,083.33 | $85,416.70 |

Maker may prepay all or any part of this note at any time, without penalty, and any prepayment will be applied to the next payment or payments coming due. Each payment and prepayment will be applied first to expenses and late charges, if any, second to interest, and third to principal. The "Maturity Date" of this note is August 1, 2003.

If any payment of principal and/or interest due under this note is not tendered in full by Maker to Holder within 10 days following Maker's receipt of written notice that any payment of principal and/or interest was not received when due ("Grace Period"), then Maker will be in default ("Event of Default") and Holder may then accelerate the due date of this note (i.e., make all principal and interest immediately due and payable). The due date of this note will be

automatically accelerated if Maker voluntarily or involuntarily becomes the subject of any reorganization, liquidation, or other type or reorganization proceeding.

On the occurrence of an Event of Default, or the failure of Maker to pay all sums due under this note on or prior to the Maturity Date, Holder shall be entitled to receive and Maker shall pay interest on the entire unpaid principal sum at the rate of 1.5 percent per month or the maximum rate of interest that Maker may pay by law, whichever is lower, to be computed from the date of occurrence of the Event of Default until the default is fully cured. This charge shall be added to the amount owed under this note. This clause shall not be construed as an agreement or privilege to extend any date on which payment is due under this note, or as a waiver of any other right or remedy accruing to Holder by reason of the occurrence of any Event of Default.

In the event that Maker tenders payment after the Grace Period, Holder is not obligated to accept such tender but may, as a condition to accepting such tender, require Maker to pay a late payment fee equal to 5% of the amount of tendered payment. This clause shall not be construed as an agreement or privilege to extend any date on which payment is due under this note, or as a waiver of any other right or remedy accruing to Holder by reason of the occurrence of any Event of Default.

Maker promises and agrees to pay Holder's reasonable attorney fees and collection costs in enforcing payment of this note whether or not such enforcement occurs in connection with a civil proceeding or insolvency proceeding, including on any appeal. All rights and remedies of Holder under this note under applicable law are cumulative and not mutually exclusive.

This note is subject to Maker's right to set off any amount due hereunder against any amount that Holder, Michael Martorano ("Martorano"), and/or William Sefton ("Sefton") are obligated to pay Maker pursuant to the Stock Purchase and Option Agreement ("Stock Purchase Agreement") of even date with this note among Maker, Holder, Martorano, and Sefton based on a breach by Holder, Martorano, and/or Sefton of any of their representations, warranties, or covenants in the Stock Purchase Agreement.

This note may not be modified, amended, waived, changed, discharged, or terminated orally or by any act or failure to act on the part of Maker or Holder, but only by a written agreement signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge, or termination is sought.

Maker waives presentment, acceptance, protest, dishonor, and notice of any of the foregoing. This note will be governed by the substantive provisions of Illinois law.

FIRST AMERICAN REAL ESTATE INFORMATION
SERVICES, INC.

By: _____

Its: _____

EXHIBIT A – PAGE 74

$_____                                    _____

## PROMISSORY NOTE

       **FOR VALUE**, the current receipt and reasonable equivalence of which are hereby acknowledged, **Consumer Benefit Services, Inc.**, an Illinois corporation (" Maker"), promises and agrees to pay to the order First American Real Estate Information Services Inc., a California corporation ("Holder"), at 12395 First American Way, Poway, California 92064 (or such other address as Holder shall specify to Maker in writing), the principal amount of $_____ in lawful money of the United States of America and interest thereon as set forth in this note. Maker will pay the principal amount of this note in the 12 quarterly installments each of $_____, and, prior to the occurrence of an Event of Default (as defined below), will pay accrued interest at the rate of ____% per annum on the unpaid principal balance of this note on each quarterly principal payment date. The first quarterly principal payment date will be the last day of the next calendar month after the date of this note, and each successive quarterly principal payment date will be the last day of the third calendar month following the calendar month in which the prior payment was due. The date on which the final installment of principal and interest under this note is due is the "Maturity Date."

       Maker may prepay all, but not less than all, of amount of this note then outstanding at any time; provided, however, that in the event of a prepayment, Maker will pay Holder a prepayment fee equal to $_____.

       On the occurrence of an Event of Default, Holder may then accelerate the due date of this note (i.e., make the entire amount of this note immediately due and payable). For purposes of this note, an Event of Default will be deemed to have occurred if (a) any payment due under this note is not tendered in full by Maker to Holder within 10 days after Maker's receipt of written notice that a payment was not received by Holder when due, or (b) Maker is in default under the terms of the Stock Pledge Agreement between Maker and Holder of even date herewith ("Stock Pledge Agreement") and Maker has not fully cured the default by the expiration of any notice or grace period provided under the Stock Pledge Agreement. The due date of this note will be automatically accelerated if Maker voluntarily or involuntarily becomes the subject of any reorganization, liquidation, or other type or reorganization proceeding.

       On the occurrence of an Event of Default or the failure of Maker to pay in full all sums due under this note on or before the Maturity Date, Holder shall be entitled to receive and Maker shall pay interest on the entire unpaid amount of this note at the rate of 1.5 percent per month or the maximum rate of interest that Maker may pay by law, whichever is lower, to be computed from the date of occurrence of the Event of Default until the default is cured. This charge shall be added to the amount owed under this note, and shall be deemed secured by the Stock Pledge Agreement.  This clause shall not be

construed as an agreement or privilege to extend any date on which payment is due under this note, or as a waiver of any other right or remedy accruing to Holder by reason of the occurrence of any Event of Default.

In the event that Maker tenders payment on this note after the 10 day notice period referred to above, Holder is not obligated to accept such tender but may, as a condition to accepting such tender, require Maker to pay a late payment fee equal to 5% of the amount of tendered payment or the maximum amount permitted by applicable law. This clause shall not be construed as an agreement or privilege to extend any date on which payment is due under this note, or as a waiver of any other right or remedy accruing to Holder by reason of the occurrence of any Event of Default.

This note is secured pursuant to the Stock Pledge Agreement, and all of the terms, covenants, and other provisions of the Stock Pledge Agreement are incorporated herein to the same extent as if fully set forth herein.

Maker promises and agrees to pay Holder's reasonable attorney fees and collection costs in enforcing payment of this note and the provisions of the Stock Pledge Agreement, whether or not such enforcement occurs in connection with a civil proceeding or insolvency proceeding, including on any appeal. All rights and remedies of Holder under this note under applicable law are cumulative and not mutually exclusive.

This note may not be modified, amended, waived, changed, discharged, or terminated orally or by any act or failure to act on the part of Maker or Holder, but only by a written agreement signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge, or termination is sought. No release of any security for this note shall release, modify, amend, waive, extend, change, discharge, terminate, or affect any liability of Maker.

Maker waives presentment, acceptance, protest, dishonor, and notice of any of the foregoing. This note will be governed by the substantive provisions of Illinois law.

CONSUMER BENEFIT SERVICES, INC.

By:_____

Its:_____

**EXHIBIT C**

## STOCK CERTIFICATE LEGEND

THE SHARES OF COMMON STOCK REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO THE PRIOR RIGHTS OF FIRST AMERICAN REAL ESTATE INFORMATION SERVICES, INC. ("FIRST AMERICAN"), AS SET FORTH IN THE STOCK PURCHASE AND OPTION AGREEMENT DATED JULY 31, 2000 ("STOCK PURCHASE AGREEMENT"), TO WHICH THE OWNER OF SUCH SHARES IS A PARTY. NO TRANSFER OR PURPORTED TRANSFER OF SUCH SHARES SHALL AFFECT FIRST AMERICAN'S RIGHTS UNDER THE STOCK PURCHASE AGREEMENT.

IN ADDITION, THE SHARES OF COMMON STOCK REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO SIGNIFICANT RESTRICTIONS ON TRANSFERABILITY UNDER THE TERMS OF THE BUY-SELL AGREEMENT, TO WHICH THE OWNER OF SUCH SHARES IS A PARTY. A COPY OF THIS AGREEMENT IS ON FILE AT THE COMPANY'S HEADQUARTERS.

1

**PROOF OF SERVICE**

2 STATE OF CALIFORNIA, COUNTY OF ORANGE

3       I am employed in the County of Orange, State of California.  I am over the age of
4 18 and not a party to the within action; my business address is 610 Newport Center
Drive, Suite 700, Newport Beach, CA 92660.
5
        On March 28, 2003, I served the foregoing document described as **NOTICE OF**
6 **REMOVAL OF ACTION UNDER 28 U.S.C. § 1441(b)** on the following person(s) in
7 the manner indicated:

8
                        **SEE ATTACHED SERVICE LIST**
9
[ X ]  (BY MAIL) I am familiar with the practice of Call, Jensen & Ferrell for
10 collection and processing of correspondence for mailing with the United States Postal
Service.  Correspondence so collected and processed is deposited with the United States
11 Postal Service that same day in the ordinary course of business.  On this date, a copy of
said document was placed in a sealed envelope, with postage fully prepaid, addressed as
12 set forth herein, and such envelope was placed for collection and mailing at Call, Jensen
13 & Ferrell, Newport Beach, California, following ordinary business practices.

14 [   ]  (BY FEDEX)  I am familiar with the practice of Call, Jensen & Ferrell for
15 collection and processing of correspondence for delivery by overnight courier.
Correspondence so collected and processed is deposited in a box or other facility
16 regularly maintained by FedEx that same day in the ordinary course of business. On this
date, a copy of said document was placed in a sealed envelope designated by FedEx
17 with delivery fees paid or provided for, addressed as set forth herein, and such envelope
18 was placed for delivery by FedEx at Call, Jensen & Ferrell, Newport Beach, California,
following ordinary business practices.

19
[   ]  (BY FACSIMILE TRANSMISSION)  On this date, at the time indicated on the
20 transmittal sheet, attached hereto, I transmitted from a facsimile transmission machine,
which telephone number is (949) 717-3100, the document described above and an
21 unsigned copy of this declaration to the person, and at the facsimile transmission
22 telephone numbers, set forth herein.  The above-described transmission was reported as
complete and without error by a properly issued transmission report issued by the
23 facsimile transmission machine upon which the said transmission was made
immediately following the transmission.
24
        I declare under penalty of perjury under the laws of the State of California that
25 the foregoing is true and correct, and that this declaration was executed on March 28,
26 2003, at Newport Beach, California.

27

28
                                    _____
CALL, JENSEN &                      Debra Threlkeld
FERRELL
A PROFESSIONAL
CORPORATION

78

1

## SERVICE LIST

2

3   Daniel M. Livingston, Esq.                    **Attorneys for Plaintiff**
    Thomas L. Vincent, Esq.
3   PAYMENT & FEARS LLP
4   4 Park Plaza, Suite 1100
    Irvine, CA  92614
5   FAX: (949) 851-1100
    TEL:  (949) 851-1212
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CALL, JENSEN &
FERRELL
A PROFESSIONAL
CORPORATION

79

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE SECOND PAGE OF THIS FORM.)

## I. (a) PLAINTIFFS

FIRST AMERICAN REAL ESTATE INFORMATION SERVICES, INC., a California corporation

## DEFENDANTS

CONSUMER BENEFIT SERVICES, INC., an Illinois corporation; FACBS LLC, a California limited liability company; and DOES 1 through 50, inclusive

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF   San Diego
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT   Du Page, IL
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED.

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Payne & Fears LLP
4 Park Plaza, Suite 1100
Irvine, CA 92614
(949) 851-1100

ATTORNEYS (IF KNOWN)

JENSEN & FERRELL
610 Newport Center Drive, Suite 700
Newport Beach, CA 92660
949-717-3000

FILED
MAR 28
'03 CV 0633B   JAH
SOUTHERN
BY

## II. BASIS OF JURISDICTION (PLACE AN 'X' IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff
☐ 2 U.S. Government Defendant
☐ 3 Federal Question (U.S. Government Not a Party)
☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN 'X' IN ONE BOX FOR
(For Diversity Cases Only)   PLAINTIFF AND ONE BOX FOR DEFENDANT)

| | PT | DEF | | PT | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.
DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)   Corp. Code Sec. 17351. Plaintiff seeks involuntary dissolution of limited liability company and seeks damages pursuant to a breach of contract cause of action.

## V. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Medical Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 640 R.R. & Truck | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 650 Airline Regs. | ☐ 840 Trademark | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 660 Occupational Safety/Health | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 690 Other | ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☒ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | **LABOR** | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 710 Fair Labor Standards Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 720 Labor/Mgmt. Relations | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motion to Vacate Sentence | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **HABEAS CORPUS:** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 871 IRS - Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Conditions | | | |

## VI. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 Original Proceeding
☒ 2 Removal from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23   DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ YES ☒ NO

## VIII. RELATED CASE(S) IF ANY (See instructions):

JUDGE _____   Docket Number _____

DATE   March 28, 2003

SIGNATURE OF ATTORNEY OF RECORD   DAVID R. SUGDEN

::ODMA\PCDOCS\WORDPERFECT\22816\1 January 24, 2000 (3:10pm)

CB $750 92615 04/01/03